Mathilda Wolfenstein, Doing Business as Maison Mathilde, Respondent, *v.* Fashion Originators Guild of America, Inc., and Another, Appellants.

First Department, May 31, 1935.

*Milton C. Weisman* of counsel [*Herbert S. Keller* and *Arthur Sheinberg* with him on the brief; *Weisman, Quinn, Allan & Spett*, attorneys], for the appellant Fashion Originators Guild of America, Inc.

*Louis Broido* of counsel [*Milton S. Harrison* with him on the brief; *Louis Broido*, attorney], for the appellant Uptown Retail Annex of the Fashion Originators Guild of America.

*John Bogart* of counsel [*Nathan Dinkes* with him on the brief; *John Bogart*, attorney], for the respondent.

UNTERMYER, J. The defendant Fashion Originators Guild of America, Inc., is a membership corporation consisting of manufacturers of high-grade and originally styled ladies' dresses. The defendant Uptown Retail Annex of the Fashion Originators Guild of America is an affiliated association whose members are engaged in the sale at retail of dresses of the character manufactured by members of Fashion Originators Guild. The plaintiff, who in 1932 became a member of the Uptown Retail Annex, has secured an injunction restraining the defendants from directing any manufacturer to refuse to deal with her and from disciplining any of their members for doing so.

The purposes for which Fashion Originators Guild was formed, as they are expressed in its certificate of incorporation, are " to protect the originators of fashions and styles against copying and piracy of styles of any trade or industry; to promote co-operation and friendly intercourse in the wearing apparel industries; to establish and maintain uniformity and certainty in the customs and commercial usages of trade; to acquire, preserve and disseminate information and literature which will tend to augment the sale of the commodities manufactured or sold; to advance the trade and commercial interests of its members and to foster the industries of its members throughout the Americas, and to promote the sale, identification and recognition of original style and merchandise of the industries of its members." After the formation of Fashion Originators Guild, the Uptown Retail Annex, consisting of retailers handling this class of merchandise, was organized. Its function is to co-operate with the Fashion Originators Guild in advancing the interests of the members by eliminating practices which are regarded as injurious to the trade. To that end these two organizations entered into an agreement setting forth the conditions under which their members would transact business. Thereby the retailers agreed to refrain from these detrimental practices in the purchase and sale of merchandise and the wholesale manufacturers agreed not to sell to any retail firm engaged in the practices which it was desired to repress.

The particular practices against which these prohibitions were directed are: (1) Style piracy, whereby a retailer would make copies of the original design of a manufacturer, thereby securing without expense the benefit of his artistic work; (2) sales of merchandise by manufacturers in their own showrooms in retail quantities at wholesale prices, thereby directly competing with retail distributors, and (3) sales by retailers in apartments used for residential purposes, thereby placing at a disadvantage other retailers who conducted business under the usual retail conditions and upon whom manufac-

turers depended as the principal outlet for their product. The agreement between the Fashion Originators Guild and the Uptown Retail Annex, signed also by the plaintiff when she was admitted to membership, among other provisions contained the following: " the sale of such merchandise as is herein referred to from private homes, offices and elsewhere by parties without responsibility and by sales in manners and fashions other than in the ordinary, open and regular retail sale thereof, are all contributing factors to the foregoing evils and are harmful to the ethical, successful, reasonable conduct of the business of established retailers, the success of whom is requisite to the success of the manufacturer and the members of the Guild." It was accordingly provided that no member of Fashion Originators Guild would " sell any merchandise in his showrooms at retail to any persons or corporations and will not sell any of his merchandise to any person or corporation which disposes or sells such merchandise except openly and in the regular retail manner and fashion from regular retail premises."

Consistent with these purposes, the Uptown Retail Annex, on December 19, 1932, adopted a resolution to the effect that its members " confine their business only to such wholesalers who agree to desist from selling at retail in their showrooms, and to desist from selling to the apartment or ' speakeasy ' shop, and who agree to confine their merchandise only to legitimate retail outlets." In June, 1934, a further resolution was adopted by the Uptown Retail Annex, as follows:

" *Resolved,* that members conducting their business from apartment houses, whether with or without living quarters attached, on and after October 1, 1934, be eliminated from membership in the Uptown Retail Guild.

" *Resolved,* that membership in the Uptown Retail Guild on and after October 1, 1934, shall be limited to those retailers conducting their businesses from regularly accepted retail establishments in either street-level store locations or in buildings occupied solely for business purposes."

The plaintiff operates a retail dress establishment in her apartment at 12 West Seventy-second street, where she serves customers, who, she alleges, purchase apparel which is original in fashion and design. This apartment the plaintiff occupies not only for business but for residential purposes, and for that reason she was excluded from membership in the Uptown Retail Annex in June, 1934. For that reason also, the Fashion Originators Guild refuses to permit its members to sell to the plaintiff garments produced by them, which on account of originality and style she alleges to be essential for the requirements of her business. The complaint

and moving affidavit contain general allegations to the effect that these acts of the defendants were induced by malice towards the plaintiff and that they are the result of a conspiracy. But it is clear beyond the point of contradiction that the acts complained of have been committed only for the purpose of compelling the plaintiff to conduct her business in accordance with the requirements of the Uptown Retail Annex, of which she is a member, and of Fashion Originators Guild, from whose membership she purchases the garments which she resells. Consequently, the plaintiff is not in any position to complain unless the requirement in question is such that it constitutes an unlawful interference with her rights.

The plaintiff asserts that her rights are violated in that she is the victim of an illegal boycott by the defendants and because the acts complained of constitute a violation of section 340 of the General Business Law, known as the Donnelly Act, which renders unlawful contracts creating a monopoly in the manufacture or sale of any article or commodity of common use. In our opinion these contentions cannot be sustained. The members of these associations had the right to co-operate for the purpose of correcting abuses or to stabilize the industry, provided their endeavors did not amount to an unlawful boycott or constitute an unreasonable restraint of trade. (*Appalachian Coals, Inc.*, v. *United States*, 288 U. S. 344.) In the present case there was no intent or power to regulate prices nor even to control production. Indeed, the members of Fashion Originators Guild are not prevented from selling to retailers who are not members of the Uptown Retail Annex. The members of the Uptown Retail Annex are not prevented from buying from manufacturers who are not members of Fashion Originators Guild. The effect of the arrangement is to exclude from membership in the Uptown Retail Annex, and to prohibit sales by members of Fashion Originators Guild to retailers who engage in practices which both organizations have united in denouncing as inimical to the trade. In this we perceive nothing arbitrary, unreasonable or unduly in restraint of trade. Limiting our consideration to the particular requirement which is challenged here, it is evident that its purpose is to protect the interests of the wholesale manufacturer by protecting the interests of the retailer through whom he sells. If the members of the Fashion Originators Guild shall sell to persons who transact their business in apartments used for residential purposes, it will imperil and may destroy the business of the merchant which is conducted at great expense from the usual retail premises. This will necessarily result in disorganizing the market on which the manufacturers depend. We think they are not powerless to co-operate for their own protection by

excluding sales to retailers whose practices, it is believed, are subversive of the industry in which they are engaged. Many similar arrangements, not intended to control prices or limit production, but devised to eliminate abuses or stabilize the industry, have been sustained by the Supreme Court of the United States (*Anderson v. United States*, 171 U. S. 604; *Chicago Board of Trade v. United States*, 246 id. 231; *Maple Flooring Assn. v. United States*, 268 id. 563) and also by this court (*Arnold v. Burgess*, 241 App. Div. 364; *New York Clothing Manufacturers' Exchange, Inc., v. Textile Finishers Assn., Inc.*, 238 id. 444). They do not constitute an illegal boycott (*Park & Sons Co. v. National Druggists' Assn.*, 175 N. Y. 1; *Bossert v. Dhuy*, 221 id. 342) and are neither against public policy as in restraint of trade nor in violation of the Donnelly Act (General Business Law, § 340).

There is yet another reason for denying injunctive relief to the plaintiff. The plaintiff conducts her retail business in a district which concededly is zoned by ordinance exclusively for residential purposes (Building Zone Resolution, art. 2, § 2), which ordinance provides also (Art. 5, § 23) that violation thereof shall constitute a misdemeanor. Should a court of equity defend by its injunction a business which is tainted with such illegality in order that it may be rendered more remunerative? Those who come into a court of equity must come with " clean hands." Seeking relief against the illegal acts of others, they must themselves be free from the imputation of illegality in respect of the transaction of which they complain. (*Fetridge v. Wells*, 4 Abb. Pr. 144; *Hobbs v. Francais*, 19 How. Pr. 567.) This does not mean, of course, that a plaintiff may not appeal to equity because he is generally of evil character or engaged in a violation of law otherwise than in the matter in which he seeks the assistance of the court. But if the rights which he asserts and for the protection of which he seeks the interposition of the equitable power of the court constitute a violation of law, then a court of equity will decline to act and will remit him to his legal remedies. " The courts do not, in such cases, take into consideration the attitude of the defendant. Although the defendant's conduct is without justification, this, in the view of a court of equity, affords no reason for interference." (*Prince Mfg. Co. v. P. M. P. Co.*, 135 N. Y. 24.) The principle has been most frequently applied in cases where the plaintiff has sought to restrain the defendant from unfair methods of competition. In such cases the defense of " unclean hands " has been held to preclude equitable relief where it appeared that the plaintiff was guilty of selling his product to the public under a misrepresentation of fact. (*Manhattan Medicine Co. v. Wood*, 108 U. S. 218; *Worden v. California Fig Syrup Co.*, 187 id.

516; *Glyn* v. *Weston Feature Film Co.*, [1916] L. R. 1 Ch. 261; *Chamberlain Medicine Co.* v. *Chamberlain Medicine Co.*, 43 Ind. App. 213; 86 N. E. 1025.) The principle, however, is of general application and is not limited to cases of this character. (21 C. J. § 177, p. 190; *Weiss* v. *Herlihy*, 23 App. Div. 608; *Pocono Pines Assembly* v. *Miller*, 229 Penn. St. 33; 77 A. 1094; *Sweeney* v. *Wilkes Barre*, 62 Penn. Super. Ct. 54.) That principle prevents the plaintiff from securing relief by injunction in order that, with greater profit to herself, she may continue to violate the law.

The order appealed from should be reversed, with twenty dollars costs and disbursements, and the motion denied, with ten dollars costs.

MARTIN, P. J., McAVOY and O'MALLEY, JJ., concur; MERRELL, J., dissents and votes to affirm.

Order so far as appealed from reversed, with twenty dollars costs and disbursements, and motion denied, with ten dollars costs.