WM. FILENE'S SONS CO. v. FASHION ORIGINATORS' GUILD OF AMERICA, Inc., et al.

No. 3223.

Circuit Court of Appeals, First Circuit.

June 1, 1937.

See, also, 14 F.Supp. 353.

Edward F. McClennen, of Boston, Mass. (Jacob J. Kaplan, of Boston, Mass., on the brief), for appellant.

Charles B. Rugg, of Boston, Mass., and Milton C. Weisman, of New York City (Ropes, Gray, Boyden & Perkins, of Boston, Mass., of counsel), for appellees.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

WILSON, Circuit Judge.

This is an appeal from a decree of the District Court of Massachusetts in a bill in equity praying for an injunction against the continuance of an alleged conspiracy in the restraint of and to monopolize interstate commerce in violation of sections 1 and 2 of chapter 1 of title 15 U.S.C.A. known as the Sherman Anti-Trust Act, and for relief under section 16 of the Clayton Act (Title 15 U.S.C.A. § 26) against threatened loss and damage by the violation of the Sherman Act.

The case was first heard before a judge of the District Court on motion for a preliminary injunction, which was denied. The case was then referred to a special master to hear the parties and their evidence and report to the court his findings of fact and his conclusions of law thereon. The evidence before the master was not reported and the District Court in a final decision stated that, so far as the report presents findings of fact, they are adopted by the District Court as the statement of facts required by Equity Rule No. 70½, 28 U.S.C.A. following section 723. We must accept the facts as found by the master.

The master reported the following facts: The plaintiff, Wm. Filene's Sons Company, hereinafter referred to as Filene's, owns and operates a ready-to-wear specialty store in Boston, with numerous branches in other parts of Massachusetts, and owns all the capital stock of R. H. White Company, hereinafter called White's, which operates a department store in Boston.

The defendant Fashion Originators' Guild of America, Inc., hereinafter called The Guild, is a corporation organized under the laws of New York on March 7, 1932.

Prior to the war, the ladies' ready-to-wear industry was of small consequence. Shortly after the war, the manufacture and sale of ready-to-wear dresses became more common, and the volume of sales of such dresses increased year by year, until in 1934 the dollar volume of such sales in this country reached a level of $430,000,000.

Some manufacturers of ready-to-wear dresses originate their own styles for the dresses they make. Other manufacturers do not originate their own styles, but copy the styles and designs of other manufacturers. Manufacturers who originate their own styles and designs are called "original creators," and manufacturers who copy the styles and designs of other manufacturers are called "copyists."

The copying of other manufacturers' styles and designs is commonly called in the trade "style piracy" or "design piracy." The terms "style" and "design" are sometimes used as though they were synonymous. But strictly speaking, "style" as applied to a dress refers to its general characteristics, such as the length of the skirt, the size of the sleeves, the height of the waist, etc.,

while "design" as applied to a dress includes all the details involved in its make-up. A style is a type, while a design is an interpretation of the style. A single style, therefore, may be followed in almost any number of different designs.

Styles in ladies' dresses are usually determined in the so-called style centers of the world, of which Paris is the principal one. A manufacturer who is an original creator generally sends his stylists and designers to Paris for inspiration. After making observations and determinations, such stylists and designers prepare their own designs and use their knowledge of the probable requirements of their employers' customers and their own ideas as to what will be popular with the buying public which they serve. Styles and designs prepared in this way are considered in the industry to be original creations.

There are five seasons a year in the dress industry, the spring season, the summer season, the fall season, the winter season, and the winter resort season.

A manufacturer makes up a line of samples for each season. The cost to produce a single line is between $30,000 and $50,000. When a line has been prepared, it is put on display in the manufacturer's showroom and is there shown to prospective retail buyers.

The period between the first order of a dress of a particular style and design and the last substantial reorder of it is called the "style life" of the dress, which is usually not more than three months.

A manufacturer who is a copyist does not send stylists or designers to Paris for inspiration. Instead he copies original designs of other manufacturers, which is accomplished in different ways. Sometimes a copyist buys dresses from retailers who have purchased them from original creators. Sometimes employees of copyists visit the showrooms of original creators and memorize or take notes of the details of the original design there displayed. Sometimes copyists obtain sketches or photographs of successful designs of original creators from agencies which make a business of supplying such sketches and photographs. Sometimes copyists bribe employees of original creators to furnish samples of their employers' original designs or to let them see samples from which they make sketches, and occasionally the original designs are stolen from the original creators.

Copying destroys the style value of dresses which are copied. Women will not buy dresses at a good price at one store if dresses which look about the same are offered for sale at another store at half those prices. For this reason, copying substantially reduces the number and amount of reorders which the original creators get. With this uncertainty with respect to reorders, original creators cannot afford to buy materials in large quantities as they otherwise would. This tends to increase the cost of their dresses and the prices at which they must be sold.

Reputation for honesty, style, and service is an important asset of retailers. Copying often injures such a reputation. A customer who has bought a dress at one store and later sees a copy of it at another store at a lower price is quite likely to think that the retailer from whom she bought the dress lacks ability to select distinctive models and that she has been overcharged. Dresses are returned and customers are lost.

In the spring of 1935 in dollar volume a very large per cent. of the total ready-to-wear dress business in the United States was in copies. Prior to the activities of The Guild, manufacturers of cheaper dresses copied most of their designs.

With the dress industry in a seriously chaotic state, due in large part to the prevalence of "style piracy," a group of dress manufacturers who were original creators organized The Guild in 1932. The purposes for which The Guild was formed as set forth in its certificate of incorporation are as follows:

"To protect the originators of fashions and styles against copying and piracy of styles of any trade or industry; to promote co-operation and friendly intercourse in the wearing apparel industries; to establish and maintain uniformity and certainty in the customs and commercial usages of trade; to acquire, preserve and disseminate information and literature which will tend to augment the sale of the commodities manufactured or sold; to advance the trade and commercial industries of its members throughout the Americas and to promote the sale, identification and recognition of original style and merchandise of the industries of its members."

A registration bureau was established by The Guild in 1933. Its purpose was to record the fact that an applicant for registration claimed that the dress whose registration he sought was his own original design. A regulation of The Guild required that when registered dresses were shipped to

customers they should bear Guild labels, to the effect that the dress was an original design registered by a member of the Fashion Originators' Guild.

At the time of the formation of The Guild its members comprised principally manufacturers selling dresses at wholesale at $22.50 and up. Later other manufacturers became members of or were affiliated with The Guild, who were engaged principally in manufacturing dresses which sold at wholesale at $16.75 and above. In the latter part of 1936 the Association of Buying Offices, representing some 1,700 retail stores, requested The Guild to extend its style protection program to lower priced dresses, and later manufacturers of dresses wholesaling at low as $3.75 were admitted as protective affiliates of The Guild. At the end of 1935 a total of about 12,000 retailers were co-operating with The Guild. When members or affiliates of The Guild received orders from retailers who were not in fact co-operating with The Guild, or who had not signed declarations of co-operation, they declined to accept such orders.

When it is established to the satisfaction of The Guild that the retailer is not co-operating with The Guild in its efforts to suppress style piracy, The Guild notifies all its members and affiliates by sending them red cards stating the facts. After a retailer has been so notified, members and affiliates of The Guild are not to sell any merchandise to the retailer unless and until he evidences his intention to co-operate with The Guild.

The rules and regulations of The Guild are enforced by fines and expulsion from The Guild for a third offense in any one year, which the master found to be reasonable regulations.

In the spring of 1936 there were about 3,000 dress manufacturers in the United States. Of these 2,130 were in New York City and about 870 outside New York City. Of the 2,130 manufacturers in New York City only 130 were Guild members or affiliates. Of the 870 manufacturers outside New York City only 14 were Guild members or affiliates.

During the year ending May, 1935, dress manufacturers in the United States produced about 84,000,000 dresses. Of this number of dresses manufacturers who were members or affiliates of The Guild on May 27, 1936, produced less than 4,600,000, or less than 6 per cent. of the total. Of the more than 80,000,000 dresses produced in the New York market, less than 43,000,000 were pro-

duced by manufacturers who were members or affiliates of The Guild on May 27, 1936. Of the less than 4,000,000 dresses produced outside of the New York market, less than 330,000 dresses were produced by manufacturers who were members or affiliates of The Guild.

The master found that, although the members and affiliates of The Guild held a very important position in the New York market so far as dresses wholesaling at $16.75 and above were concerned, they did not dominate the dress industry of the country. In 1933 Filene's entered into an agreement to co-operate with The Guild in eliminating "piracy" in the trade, but in 1936 it repudiated the agreement. Although the red carding of Filene's cut down the number of manufacturers from whom Filene's could buy, there remained many manufacturers, including many in the higher priced ranges, from whom it could buy and who, it appears, might copy styles and designs of members of The Guild. At no time did The Guild refuse to permit Filene's to co-operate with it and to enjoy the advantages resulting from such co-operation. Filene's by failing to co-operate with the efforts of The Guild to eliminate this unfair business practice, which Filene's in a letter to The Guild under date of July 5, 1933, characterized as an "evil," cut itself off from certain sources of supply, but in spite of that fact there remained substantial and reasonably adequate markets to which it could resort for the purchase of ready-to-wear dresses.

The master's report does not disclose any of the characteristics of an unreasonable restraint of trade or monopoly in violation of the Sherman Act (15 U.S. C.A. §§ 1–7, 15 note) the essential elements of which are (1) price control, (2) production control, (3) deterioration in quality. The fundamental test, as pointed out in Standard Oil Co. of New Jersey et al., v. United States, 221 U.S. 1, 52, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.(N.S.) 834, Ann. Cas.1912D, 734, Sugar Institute, Inc., v. United States, 297 U.S. 553, 597, 598, 56 S. Ct. 629, 641, 80 L.Ed. 859, is a detriment to the public.

The master concluded his report by finding:

"I find that the object of The Guild and its members and affiliates was to protect the dress industry from injurious and unfair practices—the principal one of which was the injurious and unfair practice of style

piracy—and to promote competition in that industry upon a sound and fair basis. I find that The Guild and its members and affiliates have not fixed or tried to fix prices, have not limited or tried to limit production and have not caused or tried to cause any deterioration in the quality of their products. I find that the object of The Guild and its members and affiliates was beneficial, rather than prejudicial, not only to the interests of the dress industry but as well to the interests of the public. I find that the activities of The Guild and its members and affiliates have carried with them no monopolistic menace and have not unduly restrained competition or unduly obstructed the course of trade.

"I conclude that the activities of The Guild, in the protection of the original creations of its members and affiliates, do not tend to create a monopoly or unduly restrain interstate commerce in violation of the anti-trust laws of the United States; that the fair-trade practice regulations of The Guild are reasonable in contemplation of law and do not tend to create a monopoly or unduly restrain interstate commerce in violation of such anti-trust laws; that the red card system, adopted and enforced by The Guild, does not constitute or result in an illegal boycott; that the concerted refusal on the part of members and affiliates of The Guild to sell to retailers who refuse to protect the original creations of such members and affiliates involves no denial or abridgement of the right of fair competition either as between manufacturers or as between retailers; that there is nothing arbitrary, capricious, unreasonable or unduly coercive as a matter of law in either the anti-piracy activities or the fair-trade practice regulations of The Guild; and that the means adopted by The Guild for carrying out its anti-piracy program are reasonable and do not unduly restrain interstate commerce."

The District Court on the coming in of the report and the plaintiff's exceptions thereto, confirmed the master's report and ordered that the plaintiff's bill be dismissed.

The plaintiff assigned as errors (1) that the District Court erred in dismissing the bill of complaint and in holding that the facts reported by the master did not constitute a violation of section 1 and section 2 of the Sherman Anti-Trust Act (15 U.S.C.A. §§ 1, 2); (2) that the defendants have combined and conspired to monopolize in interstate commerce dress designs to the extent of from 40,000 to 50,000 styles a year; that in violation of section 1 of the Anti-Trust Act (15 U.S.C.A. § 1) the defendants combined and conspired in unreasonable restraint of interstate commerce by creating and maintaining a black list of those retailers who declined to boycott non-combining manufacturers of such styles and designs, or to break their contracts with such manufacturers; (4) that the District Court erred in overruling the exceptions to the master's report in denying the plaintiff an injunction.

It is now well settled that in interpreting and applying the Sherman Anti-Trust Act the courts are guided by the so-called "rule of reason." In Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.(N.S.) 834, Ann.Cas. 1912D, 734, the court laid down the rule that contracts or combinations alleged to be in restraint of interstate commerce are not objectionable unless they impose an unreasonable restraint, such as to give a monopoly to one who enjoyed it to fix the price and thereby injure the public, or impose a limitation on production. Also see Nash v. United States, 229 U.S. 373, 376, 33 S.Ct. 780, 57 L.Ed. 1232.

The mere fact that a contract or combination regulates or imposes some restraint upon the trade in interstate commerce does not necessarily make it illegal. In the case of Board of Trade of the City of Chicago v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683, Ann.Cas.1918D, 1207, the Supreme Court said:

"The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition 'or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences."

The Sherman Anti-Trust Act, therefore, does not preclude the members of an

industry in which evils exist disorganizing trade in such industry from acting collectively in the elimination of such evils and establishing fair competitive practices. The Supreme Court further said in Appalachian Coals, Inc., et al. v. United States, 288 U.S. 344, 373, 374, 53 S.Ct. 471, 478, 479, 77 L.Ed. 825:

"A co-operative enterprise, otherwise free from objection, which carries with it no monopolistic menace, is not to be condemned as an undue restraint merely because it may effect a change in market conditions, where the change would be in mitigation of recognized evils and would not impair, but rather foster, fair competitive opportunities. Voluntary action to rescue and preserve these opportunities, and thus to aid in relieving a depressed industry and in reviving commerce by placing competition upon a sounder basis, may be more efficacious than an attempt to provide remedies through legal processes. The fact that the correction of abuses may tend to stabilize a business, or to produce fairer price levels, does not mean that the abuses should go uncorrected or that co-operative endeavor to correct them necessarily constitutes an unreasonable restraint of trade."

In the more recent case of Sugar Institute, Inc., et al. v. United States, 297 U.S. 553, 597, 598, 56 S.Ct. 629, 641, 80 L.Ed. 859, the Supreme Court said:

"The restrictions imposed by the Sherman (15 U.S.C.A. §§ 1–7, 15 note) Act are not mechanical or artificial. We have repeatedly said that they set up the essential standard of reasonableness. Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A. (N.S.) 834, Ann.Cas.1912D, 734; United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663. They are aimed at contracts and combinations which 'by reason of intent or the inherent nature of the contemplated acts, prejudice the public interests by unduly restricting competition or unduly obstructing the course of trade.' Nash v. United States, 229 U.S. 373, 376, 33 S.Ct. 780, 781, 57 L.Ed. 1232; United States v. Linseed Oil Company, 262 U.S. 371, 388, 389, 43 S.Ct. 607, 67 L.Ed. 1035. Designed to frustrate unreasonable restraints, they do not prevent the adoption of reasonable means to protect interstate commerce from destructive or injurious practices and to promote competition upon a sound basis. Voluntary action to end abuses and to foster fair competitive opportunities

in the public interest may be more effective than legal processes. And co-operative endeavor may appropriately have wider objectives than merely the removal of evils which are infractions of positive law. Nor does the fact that the correction of abuses may tend to stabilize a business, or to produce fairer price levels, require that abuses should go uncorrected or that an effort to correct them should for that reason alone be stamped as an unreasonable restraint of trade. Accordingly we have held that a co-operative enterprise otherwise free from objection, which carries with it no monopolistic menace, is not to be condemned as an undue restraint merely because it may effect a change in market conditions where the change would be in mitigation of recognized evils and would not impair, but rather foster, fair competitive opportunities. Appalachian Coals v. United States, 288 U.S. 344, 373, 374, 53 S.Ct. 471 [478, 479], 77 L.Ed. 825."

The language of the court in Appalachian Coals, Inc., v. United States, supra, 288 U.S. 344, at page 372, 53 S.Ct. 471, 478, 77 L.Ed. 825, applies particularly to the aims and purposes of The Guild:

"The evidence leaves no doubt of the existence of the evils at which defendants' plan was aimed. * * * It was afflicted by injurious practices within itself—practices which demanded correction. If evil conditions could not be entirely cured, they at least might be alleviated. The unfortunate state of the industry would not justify any attempt unduly to restrain competition or to monopolize, but the existing situation prompted defendants to make, and the statute did not preclude them from making, an honest effort to remove abuses, to make competition fairer, and thus to promote the essential interests of commerce."

■ The Supreme Court has also laid down the rule that the methods employed to achieve the ends and purposes of any trade association, if reasonable, are illegal only if the ends and purposes themselves are illegal. Cement Manufacturers' Protective Association v. United States, 268 U.S. 588, 604, 45 S.Ct. 586, 591, 69 L.Ed. 1104.

■ It is now settled that the important thing in cases under an anti-trust law is the result achieved or sought to be achieved, and the legality and means depends upon whether they are reasonably adapted to achieve a fair and legitimate purpose.

The plaintiff stresses a finding of the master that members and affiliates of The Guild register as original creations from 40,000 to 50,000 "styles" each year; but it is quite evident that the master here was using the word "styles" as synonymous with "designs." As the master defined these terms: "A style is a type, while a design is an interpretation of a style." A single style may be followed in almost any number of different designs. The registration of 50,000 different designs in a year is, therefore, quite different from the registration of 50,000 different styles.

The imposition of reasonable fines and the penalty of expulsion in the event of repeated violations as a means of making effective the rules of a trade association is permissible. Anderson v. United States, 171 U.S. 604, 616, 617, 19 S.Ct. 50, 43 L.Ed. 300; United States v. Fur Dressers' & Fur Dyers' Association, Inc. (D.C.) 5 F.(2d) 869, 872.

The master also found there was nothing illegal or in any way unreasonable in the method of determining whether or not dresses alleged to be copies of the original designs of Guild manufacturers were in fact copies, as they are submitted to a committee of retailers, and if the alleged violator is not satisfied with the committee selected, he may demand another committee, and if then dissatisfied, he may select one member, the Guild manufacturers another, and these two may select a third. This method of procedure is one frequently adopted to afford parties in dispute fair and reasonable protection.

It appeared from the findings of the master that Filene's had a reasonably adequate market outside of The Guild, and any alleged loss or damage due to the withdrawal of the privileges of The Guild was not shown to have been the result of The Guild's action.

Our attention has been called to a decision of the Federal Trade Commission in the matter of Millinery Quality Guild, Inc., et al.; but the facts found by the Trade Commission are quite different from those found by the master and adopted by the District Court in the case at bar. In the matter of the Millinery Guild the Commission found that the Guild formed a substantial majority of the originators of the leading style of high grade millinery for women. The master found the facts otherwise in the case at bar. The Commission found that the plan of the Millinery Guild,

its acts and practices were to hinder competition and to create a monopoly in the sale of women's hats in interstate commerce by increasing the price and limiting production to the injury and prejudice of the public, while the master in the case at bar found to the contrary.

Upon the facts found by the master in this case, the mandate will be:

The decree of the District Court is affirmed with costs.