**MILLINERY CREATORS' GUILD, Inc., et al. v. FEDERAL TRADE COMMISSION.**

No. 9.

Circuit Court of Appeals, Second Circuit.
Jan. 22, 1940.

Lowell M. Birrell, of New York City (Charles A. Van Patten, of New York City, of counsel), for petitioners.

W. T. Kelley, Chief Counsel, and Martin A. Morrison, Asst. Chief Counsel, Federal Trade Commission, and James W. Nichol, Sp. Atty., all of Washington, D. C., for respondent.

Weisman, Quinn, Allan & Spett, of New York City (Milton C. Weisman and Melvin A. Albert, both of New York City, of counsel), for Fashion Originators Guild of America, Inc., amicus curiæ.

Before SWAN, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

CLARK, Circuit Judge. .

This is a petition by Millinery Creators' Guild, Inc., and its members, for review of respondent's cease and desist order directed against petitioners' plan to prevent so-called "style piracy" of designs in women's hats. Such plan was found by respondent to be an unfair method of competition under § 5 of the Federal Trade Commission Act, 15 U.S.C.A. § 45.

Millinery Creators' Guild, Inc., formerly Millinery Quality Guild, Inc., is a trade association organized as a stock corporation under the laws of the State of New York. It has "members" which the Federal Trade Commission finds to comprise "a substantial majority" of the manufacturers of high priced women's hats, or hats which sell at wholesale for at least eight dollars. Though not stated in its certificate of incorporation, the admitted immediate purpose of the Guild is to combat the practice known as "style piracy." Original creations designed by members of the Guild and by other high priced milliners are often copied as soon as they appear in public, and the copyists manufacture and distribute their "piracies" at prices far below those charged by the originators. To eliminate this type of competition, the Guild has established a registration bureau, with which any creator of original designs and styles may register his model. Once a model is accepted by the bureau, it is the usual practice of members to accept it as an original design and style, but this is not conclusive, final determination being made by a committee of the Guild. Most of the country's major retail outlets have been approached, and over 1,600 of them have been persuaded to sign "Declarations of Coöperation." These Declarations state the intention of the retail stores not to purchase any hats which are piracies of designs registered with the Guild. Members of the Guild have agreed among themselves not to sell to any retailer who persists in purchasing from the pirates. One former member of the Guild, Milgrim Hats, Inc., was expelled from membership for failing to abide by these policies.

■ We believe that the boycott employed by the Guild is one that is unlawful under the Sherman Anti-Trust Act, 15 U. S.C.A. §§ 1, 2. Hence the Federal Trade Commission was justified in concluding that the Guild's method of restraining competition was unfair and in entering its cease and desist order. Federal Trade Commission v. Beech Nut Packing Co., 257 U.S. 441, 453, 42 S.Ct. 150, 66 L.Ed. 307, 19 A.L.R. 882; Butterick Publishing Co. v. Federal Trade Commission, 2 Cir., 85 F.2d 522, 525.

■ The anti-trust laws contravene concerted action that unduly confines important areas of competition in price, quality, or service. Unless it has this restrictive result, a combination to boycott is not necessarily unlawful. So long as the particular agreement is not intended to and does not have the necessary effect of eliminating beneficial competition, a boycott designed to prevent the commission of an illegal act may be unobjectionable. United States v. American Livestock Comm., 279 U.S. 435, 49 S.Ct. 425, 73 L.Ed. 787; Swift & Co. v. United States, 196 U.S. 375, 394, 25 S.Ct. 276, 49 L.Ed. 518; Butterick Publishing Co. v. Federal Trade Commission, supra; United States v. Sugar Institute, D. C. S. D. N. Y., 15 F.Supp. 817, 899, modified and affirmed 297 U.S. 553, 56 S.Ct. 629, 80 L.Ed. 859. In certain cases group action may permissibly have broader objectives, and a trading exchange may fix rules for trading and forbid dealing with non-members, provided again that there is no perceptible effect on legitimate methods of competition. Anderson v. United States, 171 U.S. 604, 19 S.Ct. 50, 43 L.Ed. 300; Chicago Board of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed.

683. But it is easy to overstep the line, and a boycott or other concerted action aimed at abolishing socially useful types of competition will not be tolerated. Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A.1915A, 788; Binder-up v. Pathé Exchange, 263 U.S. 291, 44 S. Ct. 96, 68 L.Ed. 308; Butterick Publishing Co. v. Federal Trade Commission, supra; United States v. Sugar Institute, supra with cases cited at 15 F.Supp. 900(1).

The permissible zone of conduct has recently been defined in Sugar Institute v. United States, 297 U.S. 553, at pages 598, 599, 56 S.Ct. 629, 642, 80 L.Ed. 859, where the Chief Justice declared: "And co-operative endeavor may appropriately have wider objectives than merely the removal of evils which are infractions of positive law," but then said, "As the statute draws the line at unreasonable restraints, a co-operative endeavor which transgresses that line cannot justify itself by pointing to evils afflicting the industry or to a laudable purpose to remove them."

We turn, then, to consider the alleged evil of style piracy, and whether its abolition will eliminate a socially useful type of competition.

What passes in the trade for an original design of a hat or a dress cannot be patented or copyrighted. An "original" creation is too slight a modification of a known idea to justify the grant by the government of a monopoly to the creator; yet such are the whims and cycles of fashion that the slight modification is of great commercial value. The creator who maintains a large staff of highly paid designers can recoup his investment only by selling the hats they design. He suffers a real loss when the design is copied as soon as it appears; the imitator in turn reaps a substantial gain by appropriating for himself the style innovations produced by the creator's investment. Yet the imitator may copy with impunity, and the law grants no remedy to the creator. Cheney Bros. v. Doris Silk Corp., 2 Cir., 35 F.2d 279.

The Guild emphasizes the immorality of style piracy, and urges that it is an abuse which honest and respectable merchants may permissibly combine to eliminate. But there are larger issues at stake here, and there were larger issues at stake in the Cheney case, than the ethical propriety of copying. The law of unfair competition has a simple rubric; an ungentle-

manly practice will be condemned so long as its condemnation will not injure the consuming public more than the ungentlemanly practice itself. Style piracy was not outlawed in the Cheney case, because to outlaw it would afford a virtual monopoly to the creator of an unpatented and uncopyrighted design. The holder of a patent or copyright has contributed valuable information to the public, and in return he has been granted a limited monopoly; Congress has not yet, however, seen fit to extend the privileges of a monopolist to the inventor of an unpatentable idea. Despite the limited holding of International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211, 2 A.L.R. 293, and its strictures against permitting one person to take a "free ride" on the labor and inventiveness of another, we believe that the public interest is best served by limiting the protection afforded an idea to the particular chattel in which it is embodied. Lewis v. Vendome Bags, Inc., 2 Cir., 108 F.2d 16; Krem-Ko Co. v. R. G. Miller & Sons, 2 Cir., 68 F.2d 872; Sinko et al. v. Snow-Craggs Corp., 7 Cir., 105 F.2d 450, 452.

It is true that concerted activity may be proper to eliminate evils, even though those evils are not violations of positive law, and the fact that the pirate is immune from legal restraint is not of itself sufficient cause to forbid the Guild from devising other means to control him. But here the courts have refrained from enjoining the pirate because they will not support a monopoly in an unpatentable idea. It would be strange to say that the Guild may establish this same monopoly by extrajudicial methods. Style piracy has been lethal in its effect on hat prices, and one of its results has been to make the latest fashions readily available to the lowest purchasing classes. The market of the high-grade originators has been sharply curtailed, and their prices have suffered correspondingly. It is safe to say that the members of the Guild instituted their anti-piracy campaign to protect their markets and price levels, as well as to improve business morals within the industry. The testimony of a representative of Peggy Hoyt, Inc., makes this graphically clear.

"Q. Were you asked to become a member of either of these two Guilds? A. Yes. * * * Mr. Earl Farrington, who is one of the best grade, what I call a wholesaler, that is, his business is strictly a

wholesaler, I have known him for 20 years, crossed with him many, many times on the boat. He called me up and suggested this idea about the fact that the millinery business was in the doldrums, you see, something had to be done about it and they had gotten together all of the leading milliners, so-called, to try to create a greater interest in women wearing hats and raising the prices for a better grade milliner because, for instance, the average milliner 15 years ago easily got $30 for every hat they sold, today the God damn thing sells for $1.95, I mean, they sell for $1.95 around town, as a result of which they practically ruin every milliner. * * *"

We believe, therefore, that concerted action to eliminate style piracy extends beyond the permissible area of industrial self-regulation. The purpose of the milliners, and the necessary effect of their combination, is to maintain their price structure, and to eliminate a distasteful "evil" which the law nevertheless recognizes to be a socially desirable form of competition. Such an antithesis is unavoidable: what is desirable competition to the consumer may be outlaw traffic to the established manufacturer. But while we maintain the competitive system, a monopoly in an idea, not recognized by positive law, must be jealously scrutinized lest the few are protected at the expense of the many. See Fly, Observations on the Anti-Trust Laws, Economic Theory and the Sugar Institute Decisions: I, 45 Yale L.J. 1339, 1348, 1371.

Petitioners point out that the similar plan of Fashion Originators' Guild of America, Inc., applicable to women's ready-to-wear dresses, was upheld in a direct action under the anti-trust laws in Wm. Filene's Sons Co. v. Fashion Originators' Guild of America, Inc., 1 Cir., 90 F.2d 556, affirming D.C.Mass., 14 F.Supp. 353, as well as under a state anti-trust law in Wolfenstein v. Fashion Originators' Guild of America, Inc., 244 App.Div. 656, 280 N.Y.S. 361. Apparently these decisions go well to the edge of permissible law, at least as we read the decisions of the Supreme Court. And the Filene case carefully distinguishes this proceeding, then pending before the Commission, by pointing out that the Fashion Guild, unlike the Millinery Guild, has no controlling position in the industry, for it contains only a limited number of manufacturers producing less than six per cent of the yearly output of ready-to-wear dresses. Whether this is a valid distinc-

tion need not now be determined, since in any event we feel that the present order is justified.

The form of the order seems appropriate to the end in view, namely, the prohibition of further boycott of retailers and manufacturers who have copied members' styles and designs in female haberdashery. It is affirmed and an order will be entered enforcing it.