### FASHION ORIGINATORS GUILD OF AMERICA, Inc., et al. v. FEDERAL TRADE COMMISSION.

#### No. 312.

Circuit Court of Appeals, Second Circuit.

July 22, 1940.

Writ of Certiorari Granted Nov. 25, 1940.

See 61 S.Ct. 175, 85 L.Ed. ——.

Weisman, Quinn, Allan & Spett, of New York City (Milton C. Weisman and Melvin A. Albert, both of New York City, of counsel), for petitioners.

Everett F. Haycraft, of Washington, D. C., for respondent.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This case comes before us on petition to review an order of the Federal Trade Commission, directing the petitioners to "cease and desist" from certain "unfair trade practices" in interstate commerce. The principal respondent below, the Fashion Originators Guild, and its members sell medium and high priced women's dresses to retailers, who select from designs exhibited in show rooms in New York City. The members make their dresses from what

they assert to be "original designs" of their own, to protect which the Guild was organized in 1932, though the designs are neither patented nor copyrighted. About a fourth of all women's dresses made in this country sell for more than $10.75, and the Guild (disregarding whether they were members for the whole year) in 1935 sold 42% of these; their sales of cheaper dresses were less, though in the next lowest grade, $6.75 to $10.75, they were 10% of the total sales in that class. (The Commission found much higher percentages than these; but for the purposes of the case it is not necessary to do more than to take the Guild's own figures.) In order to prevent what the Guild calls "style piracy," that is, the copying of their "original designs," the Guild and its members refuse in combination to sell any dresses to retailers who purchase, or order to be manufactured, dresses which the Guild finds embody copies of its designs. For that purpose it has set up a "Piracy Committee" which decides which of the designs "registered" by its members, are "originals"; it employs shoppers in various parts of the country who visit the shops of retailers and report delinquents; if a retailer is found to be selling "pirated designs," he must stop doing so, or he will get no more dresses of any sort from the Guild; nor will he be allowed to see the designs exhibited in its New York show rooms. Retailers who co-operate with the Guild must agree to accept the decision of the "Piracy Committee," and must return to sellers any dresses that have been "pirated"; they must also agree to abide by the Guild's regulations. Furthermore, in their sales they must warrant to the customer that the designs of the dresses they sell have not been "pirated." The Guild keeps a card index in which it enters upon red cards the names of those retailers who fail in any of these regards. It also maintains a group known as the "Textile Affiliates or Associates" whose members register textile designs with the "National Federation of Textiles, Inc.," and the dressmaker members of the Guild agree that they will not buy "unregistered" fabrics; conversely, textile members of the Guild agree to sell only to dressmakers who are parties to the combination. About twelve thousand retailers had signed the agreement by the end of the year 1935, and were coöperating with the Guild. Besides the Guild proper, several other subsidiary organizations were made parties to the proceeding, as well as their officers and members and those of the Guild: it is not necessary, however, to describe the relations of the subsidiaries to the parent. The Commission, having found the foregoing facts, made an order appropriate to break up the combination, which the respondents petitioned to review.

The findings are supported by an abundance of evidence and are indisputable; they do not go beyond the conceded purposes of the Guild, which does not indeed deny them, but on the contrary seeks to justify the combination. It says that the sanctions which it imposes were necessary to protect the industry as a whole from "demoralization" and the "property" of its members from appropriation. In great detail it offered to prove what were the results of allowing "style piracy" to continue; how disastrous it was to all those in the business—manufacturers, retailers and customers—how "style pirates" in some instances gained access to their designs by bribery, burglary and other crimes; how the Guild had benefited the whole industry by the elimination of such evil practices. The Commission refused to receive any evidence of the kind; it held that the combination was unlawful per se; thereby, by implication ruling that even though the combined interests of all those affected made "style piracy" an evil, the manufacturers could not lawfully unite to suppress it by the means employed.

■ At the outset a preliminary question arises which we must dispose of before we proceed to the merits. The Commission asks us not to consider the proffered evidence on the ground that the Guild's only remedy was under § 5 of the Act, 15 U.S.C.A. § 45, that is, having failed to "apply to the court for leave to adduce additional evidence", it lost its only opportunity to question or correct any ruling made during the hearing. This argument rests upon an obvious misunderstanding of the section, and would incidentally result in a procedure that would greatly hamper, if it did not destroy, the effectiveness of the Commission itself. Section 5 is not directed to the correction of errors committed by the Commission during its proceedings or at any other time; it is analogous to a motion for a new trial upon newly discovered evidence. This appears from its very language, which makes it a condition upon the relief granted that "there were reasonable grounds for the failure to adduce such evidence in the pro-

ceeding before the Commission." It is absurd to speak of the exclusion of evidence as a "failure to adduce" it. Moreover, the notion that every time an examiner erroneously rules out evidence at a hearing, the respondent must apply first to the Commission, and then to the court, to correct his error at the risk of forfeiting all right to complain, scarcely needs to be stated to be answered. It contradicts the whole presupposition on which the statute was drawn; i. e., that the court shall have no jurisdiction over the proceedings until the Commission has concluded the case. Chamber of Commerce v. Federal Trade Commission, 8 Cir., 280 F. 45, 48. Cf. Federal Power Commission v. Edison Co., 304 U.S. 375, 384, 385, 58 S.Ct. 963, 82 L.Ed. 1408; Jones v. Securities and Exchange Commission, 2 Cir., 79 F.2d 617, 619. We must therefore decide the case as though the Guild had proved what it offered to prove; that is, we must decide whether its offer was relevant. If it was, the case must go back for further hearing, because the examiner made it plain that he would hear nothing of the kind suggested; and his refusal absolved the Guild from the idle ceremony of swearing witnesses and questioning them. We proceed therefore to the merits.

■ The author of a design for a dress should be deemed to be on the same footing as the author of a drawing or a picture; and the author of a drawing or a picture has a "common-law property" in its reproduction. Prince Albert v. Strange, 1 McN. & G. 25, 43; Turner v. Robinson, 10 Ir.Ch. 121; S.C. on appeal, 10 Ir.Ch. 510; Parton v. Prang, Fed.Cas.No.10,784; Oertel v. Wood, 40 How.Prac., N.Y., 10; Oertal v. Jacoby, 44 How.Prac., N.Y., 179. The controversy as to whether "intellectual property" is lost by "publication" goes back to the Eighteenth Century. The great case of Donaldson v. Beckitt, 4 Burr. 2408, decided, although by a narrow vote, that it is not so lost; but it also decided that the statute destroyed the "property" itself; and the result in most cases was therefore the same as though publication was an abandonment, since the act applied only to published works. It would follow, if Donaldson v. Beckitt, supra (4 Burr. 2408) remains law in all that it held, that so far as the statute does not cover such property, "publication" does not destroy it, and that it is therefore perpetual. Mr. Drone in his well-known work (A Treatise on the Law of Property in Intellectual Productions, 1879) insists that this is the only proper result (pp. 116-118); but his opinion was obviously much colored by his passionate disapproval of Donaldson v. Beckitt, supra (4 Burr. 2408) anyway; and we think that the logic, if inexorably applied, is overwhelmed by the practical absurdity of the result. It would certainly be a strangely perverse anomaly that turned the grant of statutory copyright into a detriment to the "author"; yet it would be hard to prove that the statutory remedies conferred made up for the limitation of the monopoly. Omission of property from the act would be a bonanza to those who possessed property of that kind. Although it is true that when Donaldson v. Beckitt, supra (4 Burr. 2408) was decided, there was considerable "intellectual property" which the statute did not cover, we do not believe that the judges would have countenanced such a result, and the implications of Turner v. Robinson, supra (10 Ir.Ch. 121, S.C. 10 Ir.Ch. 510) were very clearly to the contrary. When in this country the Constitution (§ 8, cl. 8, Art. 1) gave to Congress power to "secure" to authors the "exclusive Right to their * * * Writings," it was to be only "for limited Times," and did not allow a perpetual copyright. The purpose so disclosed is certainly inconsistent with the assumption that an author—notwithstanding publication and full enjoyment of his "common-law property"—might maintain his monopoly for "unlimited Times". While we have been unable to discover any case which squarely presented the situation—that is, in which "intellectual property", not covered by the copyright act then in existence, was challenged because of its "publication"—there are plenty of general expressions in the books that the "common-law property" does not survive. Wheaton v. Peters, 8 Pet. 591, 658, 8 L.Ed. 1055; Bobbs-Merrill Co. v. Straus, 210 U.S. 339, 347, 28 S.Ct. 722, 52 L.Ed. 1086; American Tobacco Co. v. Werckmeister, 207 U.S. 284, 299, 300, 28 S.Ct. 72, 52 L.Ed. 208, 12 Ann.Cas. 595; Caliga v. Inter Ocean Newspaper, 215 U. S. 182, 188, 30 S.Ct. 38, 54 L.Ed. 150; Werckmeister v. American Lithographic Co., 2 Cir., 134 F. 321, 324–326, 68 L.R.A. 591; Parton v. Prang, supra, 18 Fed.Cas. 1273, page 1277, No. 10784; Palmer v. DeWitt, 47 N.Y. 532, 536–538, 7 Am.Rep. 480; Jewelers Mer. Agency v. Jewelers Publishing Co., 155 N.Y. 241, 49 N.E. 872, 41 L.R.A. 846, 63 Am.St.Rep. 666; Oertel v. Jacoby, supra, 44 How.Prac. 179, page 188;

Waring v. WDAS Broadcasting Station, 327 Pa. 433, 194 A. 631, 635, 636; Chamber of Commerce v. Wells, 100 Minn. 205, 111 N.W. 157, 159. We conclude therefore that, regardless of whether the Guild's designs could be registered or not, "publication" of them was a surrender of all its "common-law property" in them.

■ To embody a design in a dress or a fabric, and offer the dress for general sale was such a "publication"; nothing more could be done to bring it into the public demesne. It may be unfortunate—it may indeed be unjust—that the law should not thereafter distinguish between "originals" and copies; but until the copyright law is changed, or until the Copyright Office can be induced to register such designs as copyrightable under the existing statute, they both fall into the public demesne without reserve. Cheney Bros. v. Doris Silk Corp., 2 Cir., 35 F.2d 279. The Guild has therefore no more excuse for preventing other dressmakers from copying one than the other. Indeed, it is conceivable that those who might go to the trouble and expense of seeking out the best-known dressmakers of Paris, and of copying their models and designs—as was frequently done—should assert that by investing so much, they too acquired a "property" in the designs they brought back which ought to be protected against all but the author himself. We are therefore to judge the Guild as a combination seeking to exclude outsiders from a market to which they have as lawful access as it has itself.

■ A combined refusal to deal with anyone as a means of preventing him from dealing with a third person, against whom the combined action is directed, is a boycott; and a boycott is prima facie unlawful; it must be justified. United States v. American Livestock Commission, 279 U.S. 435, 437, 49 S.Ct. 425, 73 L.Ed. 787; Restatement of Torts, § 765 (1). That it can be justified we have indeed very recently said in Millinery Creators' Guild v. Federal Trade Commission, 2 Cir., 109 F.2d 175, 176; and in the case at bar for example, it would be a lawful form of self-help for members of the Guild to refuse in combination to deal with retailers who knowingly bought dresses of those who had stolen "unpublished" designs; or who got access to them by any other crime, or by a breach of promise not to use them; further, it would be lawful to refuse to deal with a retailer who knowingly bought of one who copied "unpublished" designs, without the author's consent, however the copier gained access to them. But that excuse does not extend to a boycott of retailers who buy dresses copied from "published" designs; if that is to be justified, the excuse must be found elsewhere. Many trade combinations which affect competition are lawful, when they are designed to prevent trade "abuses"; they are "reasonable," though perhaps to say so is no more than to state the problem. Appalachian Coals, Inc. v. United States, 288 U.S. 344, 374, 53 S.Ct. 411, 77 L.Ed. 825; Sugar Institute v. United States, 297 U.S. 553, 598, 56 S.Ct. 629, 80 L.Ed. 859. Certainly it is not true that the lawfulness of every combination depends upon whether it "reasonably" corrects trade "abuses"; there are some combinations that nothing will excuse. The accepted rubric for this is that when the means are unlawful per se, the purposes of the confederates will not justify them. Sugar Institute v. United States, supra, 297 U.S. 553, page 599, 56 S.Ct. 629, 80 L.Ed. 859. The most recent example of this is the Supreme Court's reäffirmation of the unconditional illegality of price-fixing, in spite of the probability that the combination in fact benefited the industry. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129. However grave the industrial disorders, that remedy was not permissible; the industry may restore itself by many devices, but not by all.

■ The case at bar is not one of price-fixing, and for that reason United States v. Socony-Vacuum Oil Co., supra, does not control, for the members of the Guild are free to compete with each other in price or in any other way they choose. The purpose was no more than to exclude "piratical" dressmakers from any share in the market for "original" designs; all else was left open. Success in that purpose might, or might not, result in an increase in price to the consumer, or in that stabilization of prices which United States v. Socony-Vacuum Oil Co., supra, condemned. Nobody can tell what will be its effect because, although the exclusion of the "piratical" dressmakers will reduce the supply and price is normally a function of supply, it does not appear that the Guild has not a reserve of producing power equal to what it excludes. If so, it may well be able to take up the slack, so to say, created

by its efforts, and free competition among the members may keep prices as low and as wayward as they were before. Price fixing is not, however, the only means unlawful per se; the interest of the consumer is not all that determines the "reasonableness" of a contract "in restraint of trade." It is also unlawful to exclude from the market any of those who supply it—assuming that there is no independent reason by virtue of their conduct to justify their exclusion—and it is no excuse for doing so that their exclusion will result in benefits to consumers, or to the producers who remain. W. W. Montague & Co. v. Lowry, 193 U.S. 38, 47, 24 S.Ct. 307, 48 L.Ed. 608; Eastern States Retail Lumber Dealers Association v. United States, 234 U.S. 600, 611, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A.1915A, 788; Binderup v. Pathé Exchange, 263 U.S. 291, 311, 312, 44 S.Ct. 96, 68 L.Ed. 308; Anderson v. Shipowners Association, 272 U.S. 359, 363, 47 S.Ct. 125, 71 L.Ed. 298; Bedford Cut Stone Co. v. Journeymen Stone Cutter's Association, 274 U.S. 37, 54, 47 S.Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791; Paramount Famous Corp. v. United States, 282 U.S. 30, 43, 44, 51 S.Ct. 42, 75 L.Ed. 145; United States v. First National Pictures, Inc., 282 U.S. 44, 54, 51 S.Ct. 45, 75 L.Ed. 151; National Harness Association v. Federal Tr. Comm., 6 Cir., 268 F. 705, 712; Wholesale Grocers Ass'n v. Federal Tr. Comm., 5 Cir., 277 F. 657, 663; Butterick Publishing Co. v. Federal Tr. Comm., 2 Cir., 85 F.2d 522. There is another reason supporting this conclusion. A successful combination among a part of the producers to exclude others, even when not accompanied by an agreement fixing prices, puts into their hands collectively the power to control the supply and with it the price. The fact that that power is not at the moment exercised is no assurance that it may not be; if the effort succeeds and the combination is not disrupted, it may at any time be used, and there will then be no protection to the consumer.

Finally, it is of no consequence that the Guild does not supply the whole market for women's dresses; it aims at a monopoly however small its share of total sales. The reason is as follows. Although all dresses made after one design are fungibles, the different designs themselves are not fungibles. Each has its own attraction for buyers; each is unique, however trifling the basis for preferring it may be. Hence to attempt to gather to oneself all possible reproductions of a given design is to attempt to create a monopoly, as at once appears from the fact that a copyright for it—and à fortiori a design patent upon it—would be ranked as a monopoly. It is true that the sanction of that monopoly may be very weak; it depends upon the design's attractions above over designs, often not a very important margin of advantage. But the same is true of nearly all monopolies, for there are substitutes for most goods. As to each design therefore the Guild is seeking to establish a monopoly; and it is unimportant whether its gross sales are large or small, as compared with those of all women's dresses. For these reasons the combination was unlawful per se; the Commission was right in refusing to hear any evidence in its excuse, for it could have no excuse; the case is the same as Millinery Creators' Guild v. Federal Trade Commission, supra, 2 Cir., 109 F.2d 175. Similarly the conduct of the examiner in shutting off cross-examination and the like—of which the Guild urgently complains—was proper; the case stood admitted, no defence was possible; indeed, so far as the Guild has any complaint whatever, it is that the hearings against it were drawn out most unnecessarily.

In 1937 the First Circuit did indeed affirm a decree which dismissed a bill in equity brought against the Guild by a retailer. Wm. Filene's Sons Co. v. Fashion Originators' Guild, 90 F.2d 556. We cannot find any distinction between the facts as there found and those which we feel bound here to take as though proved; and it follows from what we have already said that we are unwillingly forced to a different conclusion. That difference lies in the fact that, as we have said, we do not understand that a court will inquire into whether a combination benefits an industry when the means used are themselves unlawful; and that to try altogether to exclude others from manufacturing what they are free to make, is an unlawful means. If on the other hand the First Circuit believed that the "originator" of a design has an interest to protect greater than one who has merely appropriated an existing design at his own labor and expense, we cannot agree as to that either.

The order will therefore be affirmed, except that—as in Butterick Publishing Co. v. Federal Trade Commission, supra, 2 Cir., 85 F.2d 522, 526, 527—it will not be understood to apply to cases in which a re-

tailer knowingly buys dresses, access to the design of which has been procured (1) by fraud, bribery or any other crime; (2) through some breach of contract, or (3) before the design has by "publication" come into the public demesne.

Order affirmed.