Leon J. Arnold, Respondent, Appellant, v. Alexander H. Burgess, as President of Allied Building Metal Industries, an Unincorporated Association of More Than Seven Members, Appellant, Respondent.

First Department, June 8, 1934.

*Samuel R. Wachtell* of counsel [*Harold J. Manheim* and *Seon Felshin* with him on the brief; *Wachtell, Manheim & Grouf*, attorneys], for the plaintiff.

*Bernard Hershkopf* of counsel [*Karl Propper*, attorney], for the defendant.

O'MALLEY, J. The judgment appealed from awards damages and injunctive relief because of alleged unfair competition practiced by the defendant. Assuming that the decision is sufficient to justify the judgment appealed from, the question presented is whether the evidence sustains the findings made and conclusions reached.

The plaintiff, a civil engineer, furnishes " quantity surveys " to iron and wire shop owners. These surveys are computations made from building plans and specifications and are intended to show the amount and character of iron and wire required. Multigraphed facsimiles are furnished to firms and individuals and used by them as a basis for submitting bids to owners or contractors. Surveys require skill and experience in their preparation. If they should omit any part of the material required a bid predicated thereon might be too low and result in the award of an unprofitable contract. On the other hand, if the estimate of the amounts of material is too high, a bid based thereon would also be too high and the contract would likely be awarded to one whose bid was based upon an accurate survey. While the plaintiff's service was the principal one of its character in the field, he had no monopoly of quantity surveying. He admitted that many others were as competent as he to do similar work.

The defendant is the president and representative of the Allied Building Metal Industries, an unincorporated association, whose members are fabricators of metal work used in building construction. Included in its membership are some thirty-two iron and wire shop owners, one of several distinct groups included in the association. Others were an architectural iron and bronze working group. It is governed by a board of control, the chairman of which, one Donnelly, was a paid employee. Its object seems to have been that of the ordinary trade association — to promote the business interests of its membership.

Originally many iron and wire work shops had their own estimating force. Of the thirty-two in the defendant association, twenty-eight were so equipped. In others, the owners or partners attended to this phase of the work and only the small shops were dependent on outside quantity surveys.

The plaintiff began his business in 1921. Because of its efficiency and low cost (copies of plaintiff's work being furnished to a number of customers), his service commended itself to the trade. By 1927 it had grown so that the plaintiff was serving between fifty and seventy-five per cent of the potential users of such surveys, and his customers were divided about equally between members of the defendant association and non-members. About this time he added to the survey service an estimate of the cost of material to

be used and the overhead. This feature was wholly experimental and its use was optional with the customers served. Concededly it was discontinued in January, 1928, but whether under protest or objection on the part of some of the members of the defendant association, seems immaterial. Plaintiff's business had prospered, his evidence showing that for the year 1927 he received from members of the defendant association in excess of $15,000 and from nonmembers in excess of $11,000.

The parties are in substantial agreement upon the facts as thus far outlined; in partial agreement upon other facts about to be stated; and in sharp disagreement upon the motive that controlled the defendant in its discontinuance of the use of plaintiff's survey services and its decision to require each member to establish for its own use a similar service within its own organization.

Plaintiff contends that the defendant was motivated by a desire to destroy legitimate and useful competitive bidding in the trade (claimed to have been effected through his service) and to that end set about to destroy plaintiff's business. His contention in the main has been sustained by the learned justice at Special Term. The defendant on the other hand urges that it was actuated by a desire merely to further and promote the best interests of its members. This, it is urged, it had a right to do. even though its action resulted in financial loss to the plaintiff.

Early in 1928 the question of the advisability of using outside survey services such as that conducted by the plaintiff was given serious consideration and discussion among the defendant's membership. Of this the plaintiff had notice, and his advice and participation in a consideration of the question was invited. There was evidence tending to show that the plaintiff urged that all members of the association should be required to take his service. In addition, the plan of the defendant establishing a survey service for all of its members of which the plaintiff would have charge was also considered. The plaintiff was willing to accede to this plan. He also expressed his views in writing to the association, in which he submitted and discussed several propositions with a view to reaching some adjustment and agreement satisfactory to both sides.

Without reciting in detail these discussions and negotiations, suffice it to say that the defendant reached the conclusion that it would no longer permit its members to use the plaintiff's service, and further decided that it would not establish a central survey service for the use of its members under the supervision of the plaintiff. On the other hand and on March 15, 1928, it adopted a resolution approving of the recommendation of the board of control that each member of the association do its own estimating

with its own employees and refrain from patronizing any estimating bureau.

From the date of the adoption of this resolution, a great majority of defendant's members ceased using the plaintiff's service. While the plaintiff retained the patronage of some of the defendant's members and succeeded in inducing some of those who had ceased to take his service to again subscribe and continue their patronage, his income from the defendant's membership fell from some $15,000 to the nominal sum of $1,383 in 1931. There was evidence tending to show that the defendant organization, by threats of censure, at least, induced some of those who had returned to plaintiff as his customers, to refrain from longer using his service.

No secondary or illegal boycott is involved. The resolution of the defendant operated only upon its own members and plaintiff's customers from outside sources were left entirely free to continue to patronize the plaintiff. His income from such source between 1927 and 1931 continued substantially the same and in fact had increased to $15,000 in 1930, over $11,000 in 1927.

As already noted, plaintiff contends that the defendant's purpose in discontinuing his service and requiring its members to establish their own was for the purpose of destroying competitive bidding in the trade. In support of his claim evidence was offered tending to show that the defendant complained because plaintiff's service enabled the smaller and less responsible concerns in the trade (and which were unable to maintain their own survey force) to submit bids on work where they otherwise would not have been able to so do. The defendant, admitting that the plaintiff's service resulted in bids from this source, contended that experience had demonstrated that such bidding was injurious to the trade, as it enabled small and irresponsible shops to buy the service and make bids which they otherwise would never have made. The defendant's evidence tended to show also that such bids were frequently altogether too low and that many bidders used plaintiff's estimates as a basis to cut down rather than to approximate legitimate and safe prices. It was further contended that in many instances contracts were awarded to these improvident bidders with the result that prices for architectural iron and wire work were demoralized, and that even though the improvident and irresponsible bidder ultimately lost money, or failed in the course of performance of his contract, his improvident bid had an injurious effect on prices in general and necessarily operated to depress them and effect disaster. It is urged, therefore, that the defendant association was justified in reaching the conclusion that bidding from such a source and from such bidders was a menace to the interests of the

association and to the industry as a whole and that plaintiff's service and activities involved the trade in a ruinous competition.

That competition arising from improvident bidding existed and was injurious seems to have been conceded. In a paper dictated in plaintiff's presence by Donnelly, defendant's representative, to be submitted to the defendant's organization on certain matters in controversy, there is contained the following statement, as expressing plaintiff's view on this subject: " I told you then that my object was to eliminate the ruinous competition of which you have repeatedly and justly complained."

We have a situation, therefore, where both sides appear to be in accord that bidding from smaller and irresponsible concerns was ruinous to the trade. Plaintiff seems to have taken the position that this situation would be remedied by the use of his service for the reason that it would furnish to the smaller concerns an accurate basis upon which to predicate bidding. Plaintiff's counsel in his brief (p. 6) states: " The plaintiff was convinced that his service, while increasing the ' quantity ' of competition, vastly improved its quality. The likelihood of undue price depressions by immoderately low bids was, in his opinion, greatly diminished by having all the bidders use the same quantity survey as a basis for their figures. He believed that the widespread use of intelligently prepared quantity surveys would tend inevitably to improve conditions in the industry. He preached these beliefs in and out of season."

The defendant, on the other hand, reached the conclusion that the " ruinous competition " then prevailing had not been remedied through plaintiff's service, but could best be cured by discontinuing his service and requiring each member of its association to adopt and maintain its own survey service.

In these circumstances it seems to us that the defendant organization was within its rights in acting as it did, if in doing so it believed that the best interests of the trade and its membership from a competitive standpoint would be served. In addition its plan might well tend to increase employment, since it would require the maintenance of many survey forces in place of but one maintained by the plaintiff.

The Special Term has found no actual malice, and from the facts already stated, the finding that the defendant's acts constituted a conspiracy on the part of the defendant and its members to limit competition in bidding and to destroy the business of the plaintiff, was not justified. The intent was to remove a mutually recognized evil in the trade. Because plaintiff deemed his plan better suited to accomplish the desired result did not require its adoption. The defendant association and its members were not compelled to accept his solution, and when acting in good faith

they rejected it and adopted a plan of their own, their action is not to be condemned, though the enforcement of their policy might result in detriment to plaintiff. (*Appalachian Coals, Inc., v. United States*, 288 U. S. 344; *Nann* v. *Raimist*, 255 N. Y. 307.)

Such of defendant's members as violated the resolution were no more than censured in any case where charges were preferred. But even had defendant enforced its resolution through fines or expulsion, its acts would not have been illegal. Members of any organization are required to obey its rules only while membership exists. Those not willing to obey are at liberty to withdraw. (*Bossert* v. *Dhuy*, 221 N. Y. 342, 365.) True it is that the case cited involved a labor organization, but we fail to see why any distinction in this respect should be made between rights of organized employees and a trade organization of the character here involved.

Plaintiff relies on *Boutwell* v. *Marr* (71 Vt. 1, 8) which holds that the enforcement of the will of the majority of an organized body upon its members by means of fines and penalties in matters involving the rights of outside parties, is essentially the same as unity of action secured among individuals by threats or intimidation. Such is not now the law in this State. (*Bossert* v. *Dhuy, supra*.)

The case of *Martell* v. *White* (185 Mass. 255), also relied upon by plaintiff, is distinguishable. There the court merely held that upon the facts presented it had been error for the trial justice to direct a verdict in favor of the defendant, there being a question of fact as to the purposes for which the defendant organization had been formed and the intent with which they had done acts injuring the plaintiff's business. In so far as it adopts the holding of *Boutwell* v. *Marr* (*supra*), it is likewise to be disapproved.

The earlier English cases cited and relied upon by the plaintiff must yield to the holding in the comparatively recent English case of *Sorrell* v. *Smith* ([1925] App. Cas. 700), which is to the effect that if the combination is not to injure another, but to forward or defend the trade of its membership, then no wrong is committed and no action will lie, though damage to another ensue.

It follows, therefore, that the judgment appealed from should be reversed with costs to the defendant, appellant, and the complaint dismissed, with costs.

FINCH, P. J., MARTIN, TOWNLEY and GLENNON, JJ., concur.

Judgment reversed, with costs to the defendant, appellant, and the complaint dismissed, with costs. Settle order on notice reversing findings inconsistent with this determination, and containing such new findings of fact proved upon the trial as are necessary to sustain the judgment hereby awarded.