## Individual Retail Food Store Owners Assn. v. Penn Treaty Food Stores Assn. et al.

*Benjamin Frank*, for plaintiff.

*M. Herbert Syme*, for defendants.

FLOOD and LEVINTHAL, JJ., January 19, 1938.—Plaintiff association, in its bill in equity, alleges that it consists of approximately fifty retail food store owners in the northeastern section of Philadelphia and that defendant associations are similarly composed. The bill then proceeds to allege that defendants have organized them-

selves for the purpose of closing grocery and other food stores in their neighborhoods on Wednesday afternoons and Saturday evenings; that to achieve their end, they have brought pressure upon dissidents, among them plaintiffs, by intimidation, threats, picketing, and boycotting; that considerable damage, irreparable at law, has been done plaintiffs' businesses, and that several of them "have been forced to close their stores against their free will". Preliminary and permanent injunctions have been requested to restrain defendants from picketing, boycotting, "from using any means or methods tending to compel and force the members of the complainant association to close their respective stores", and "from preventing or in any way interfering with the members of the complainant association in the conduct and operation of their respective businesses."

At the hearing, which required two days, it was agreed that we consider the proceedings as an application for a permanent injunction.

### Findings of fact

1. The membership of the plaintiff association consists of approximately fifty retail food store proprietors, conducting their own businesses in the northeastern section of Philadelphia, many on main highways where much of their trade is transient.

2. The defendant associations are similarly composed, but number approximately 150 nominal members.

3. A few of the plaintiffs employ other persons to aid them in their businesses, but most of them conduct their own stores, either by themselves or with the aid of their families.

4. There is no labor dispute involved in this case.

5. Plaintiffs and defendants have for many years had their stores open for business more than 100 hours per week.

6. The immediate objective of the defendant associations is to have all food stores in their vicinity close on

Wednesday afternoons, after 1 p.m., Saturday evenings, and all day Sunday.

7. In order to induce other retail store owners to cooperate with them in closing at the times above mentioned, the members of the defendant associations visited these owners and spoke to them. The visiting committees numbered from two to fifteen men, and frequently because of their numbers inspired fear in the proprietors visited.

8. One of the plaintiffs threatened to shoot the members of a visiting committee and, he testified, " I picked up a baseball bat, and he [a defendant] went out."

9. Most of the plaintiffs refused to comply with the requests of the visiting committees. They were then told that they would "be made to close" by means of picketing.

10. On one occasion the defendants' committee implied that they might smash outside fruit stands and destroy merchandise of the recalcitrant plaintiffs.

11. The stores of various members of the plaintiff association have been picketed by two or three pickets on several Wednesday afternoons.

12. The pickets were not themselves members of the defendant associations, but were hired by the associations.

13. The pickets were instructed by defendants to keep moving, to remain a reasonable distance from the entrance to the stores, not to talk, and to indulge in no acts of violence or intimidation.

14. During the time the picketing was carried on, members of the defendant associations cruised about the neighborhood in automobiles to supervise the pickets and to assure obedience to the orders given them.

15. These orders were not always complied with. On occasion, the pickets spoke to customers, attempting to dissuade them from purchasing from plaintiffs. Abusive and obscene language was used at one time by pickets, who also spoke of a plaintiff's store as a "scab place". The pickets before one store threatened to break the win-

dows and to assault the owner. These attempts at violence and intimidation were, however, extremely rare. The only improper practice repeatedly indulged in was that of patrolling the pavements in very close proximity to the entrance of the stores of plaintiffs, thereby interfering with customers who desired to enter.

16. In the main, the picketing was peaceful, free from intimidation and consisted solely of the pickets patrolling the sidewalk, carrying placards bearing the following information: "This store will not close Wednesday afternoon. Will not coöperate with neighborhood stores." These signs state only the truth, but may be misleading by not expressly negating the possible inference of a labor dispute.

17. One of the plaintiffs, in order to counteract the effect of the picketing, placed in his window a sign on which he stated that his was a union store and that he refused to coöperate with defendants by closing Wednesday afternoons. As a result, his business, he testified, increased in the period during which the sign was in the window.

18. The business of many of the members of the plaintiff association was diminished in amount as a result of the picketing, and was not increased at any other time during the week to compensate for the diminution during the time the picketing took place.

## Discussion

The choice confronting us is threefold: Should we grant the prayer of the bill and issue an injunction restraining defendants from all picketing; should we heed the plea of defendants and decline entirely to interfere with their efforts to induce plaintiffs to coöperate with them in bringing about shorter business hours for them all, plaintiffs as well as defendants; or should we strike a mean and define the limits within which defendants may pursue their campaign and beyond which they may not venture?

This case admittedly does not involve a "labor dispute" within the provisions of the recent Labor Anti-Injunction Act of June 2, 1937, P. L. 1198, and that statute has no application here. It is, however, suggested that picketing can be tolerated by the law only as a weapon of labor in industrial strikes. That is certainly the most frequent use of picketing, but it is by no means the only one sanctioned by the courts. Thus, in Bernstein v. Retail Cleaners' & Dyers' Assn., 31 Ohio N. P. (N. S.) 433 (C. P. Cuyahoga County, 1934), the court refused to restrain picketing by competitors of a cleaning and dyeing establishment which had reduced prices below those fixed by the Cleaners' Code under the N. I. R. A. In Julie Baking Co., Inc., et al. v. Graymond et al., etc., 152 Misc. 846, 274 N. Y. Supp. 250 (Supreme Ct. Bronx County, 1934), customers were permitted to picket a bakery in protest against high prices. See comment in 4 Brooklyn L. Rev. 91 (1934) approving the decision. There are also cases of picketing in disputes between tenants and landlords concerning rentals and similar matters: Barnes-Arno Bldg. Corp. v. Hoffman, N. Y. L. J. March 6, 1933, p. 1324 (1933). But see Birnbaum v. Margosian, N. Y. L. J., March 6, 1933, p. 1323, and 1537 Fulton Ave. Corp. v. Fox, N. Y. L. J., April 24, 1933, p. 2445, 99 A. L. R. 535 (1935). Pickets have lawfully carried signs announcing that plaintiff's sale of "Kosher" chickens is no indication that the meat he sells is also "Kosher". Rosman et al. v. United Strictly Kosher Butchers, etc., 164 Misc. 378, 298 N. Y. Supp. 343 (Supreme Ct. Bronx County, 1937). The cases in which Negroes were restrainted from picketing to compel merchants to employ members of their race are not in point, as they were grounded on the danger of race riots: A. S. Beck Shoe Corp. v. Johnson et al., 153 Misc. 363, 274 N. Y. Supp. 946 (Supreme Ct. N. Y. County, 1934) ; Green et al. v. Samuelson et al., 168 Md. 421, 178 Atl. 109 (1935) ; New Negro Alliance v. Sanitary Grocery Co., Inc., 67 App. D. C. 359. And even then, those decisions have not gone entirely free from respecta-

ble criticism. See 83 University of Pa. L. R. 384 (1935), and Keith Theatre, Inc., v. Vachon et al., 134 Me. 392, 411, 187 Atl. 692, 701 (1936), where the distinction between labor disputes and other controversies made by the Beck case was said to be "difficult to justify". But see 35 Col. L. Rev. 121, and 48 Harvard L. R. 691 (1935).

No decision of any court has been called to our attention or has been found by us which precisely determines the issue which we must here pass upon.

". . . what really is before us is a conflict between two social desires, each of which seeks to extend its dominion over the case, and which cannot both have their way. The social question is which desire is strongest at the point of conflict": Holmes, Law in Science and Science in Law, 12 Harvard L. R. 443, 460-61 (1899) ; Collected Legal Papers, 210, 239 (1921).

Plaintiffs have established that their right to carry on business—a valuable right of "property": Truax et al., etc., v. Corrigan et al., 257 U. S. 312 (1921) ; Purvis v. Local No. 500, United Brotherhood of Carpenters & Joiners et al., 214 Pa. 348 (1906)—has been intentionally impaired by defendants. Defendants therefore must justify their conduct. They must show that their purpose may reasonably be regarded as socially desirable. They must satisfy us that the benefit to society and to themselves preponderates over the harm incident to their conduct. They must also convince us that in seeking to achieve their objective they are not resorting to violence or intimidation—weapons outlawed in the struggle of life in our economic system. See Holmes, Privilege, Malice, and Intent, 8 Harvard L. R. 1 (1894), and Collected Legal Papers, 117 (1921).

Plaintiffs and defendants are all proprietors of small stores, and their places of business have been open more than one hundred hours per week. Defendants contend that such a life as theirs is not truly free, and that they have no real liberty. They assert that men who must daily work all day and long into the night are "slaves". They

say they must induce plaintiffs to adopt their program of closing Wednesday afternoons, Saturday evenings, and Sundays, for without the coöperation of plaintiffs it is impossible for them to effect any change in their own "slavish" way of life.

Plaintiffs, on the other hand, with no less sincerity or fervor, contend that it is impossible for them to survive against the gruelling competition of the chain store and giant market unless they, and their families with them, work hard and long, without leisure or recreation now, but in the hope that eventually they may better their own lot and the plight of their children.

It is not our function to pass upon the relative merits of the conflicting interests of the parties to this dispute. We need only decide whether the conduct of defendants is motivated by a reasonably justifiable cause. Certainly the end which defendants seek to attain is not socially undesirable. The grocer combines in himself the function of the laborer as well as of the entrepreneur and the capitalist. His purpose to establish a maximum work-week for himself is as understandable and as justifiable as the similar desire of the man who is solely a laborer. Agreement by all his competitors is as essential to any grocer's closing on Wednesday afternoons as agreement by their employer and their fellow-employes is to the securing of improved working conditions by factory employes. It is now well established, not only by statute (Act of March 23, 1932, 47 Stat. at L. 70, 29 U. S. C. §101; Labor Anti-Injunction Act, supra; for a complete list of statutes see C. C. H. Labor Law Service, p. 8001) but by judicial decision as well, that employes may picket and thus impair their employer's right to carry on his business and also interfere with their fellow-employes' right to work, in their endeavor to improve the working conditions of all: American Steel Foundries v. Tri-City Central Trades Council et al., 257 U. S. 184 (1921); Steffes v. Motion Picture Machine Operators Union, etc., et al., 136 Minn. 200, 161 N. W. 524 (1917); Exchange

Bakery & Restaurant, Inc., v. Rifkin, etc., et al., 245
N. Y. 260, 157 N. E. 130 (1927) ; Kirmse et al. v. Adler
et al., 311 Pa. 78, 88 (1933). See Eskin on The Legality
of "Peaceful Coercion" in Labor Disputes, 85 University
of Pa. L. R. 456 (1937).

It is true that there are many all-embracing dicta in
judicial opinions of an earlier generation which deny
the possibility of "peaceful" picketing. Thus, in Atchin-
son T. & S. F. Ry. Co. v. Gee et al., 139 Fed. 582, 584 (E. D.
Iowa, 1905), it is said:

"There is and can be no such thing as peaceful picket-
ing, any more than there can be chaste vulgarity, or
peaceful mobbing, or lawful lynching." And the highest
court of Illinois, in A. R. Barnes & Co. et al. v. The Chi-
cago Typographical Union No. 16 et al., 232 Ill. 424, 436,
83 N. E. 940, 944 (1908), wrote:

"The very fact of establishing a picket line is evidence
of an intention to annoy, embarrass and intimidate,
whether physical violence is resorted to or not."

On analysis, such generalizations are found to be far
too broad. Mr. Justice Holmes, as early as 1896, in his
classic dissenting opinion in the case of Vegelahn v.
Guntner et al., 167 Mass. 92, 104, 106, 44 N. E. 1077,
1079-80 (1896), demonstrated their unreliability. If we
are not to fall into the same error committed in the early
decisions in the field of labor law, we should, in the initial
stages of a new type of economic rivalry, avoid now the
adoption of the repressive principles that for so long a
period delayed the progress of labor. See Mr. Justice
Brandeis' excellent historical summary in his dissenting
opinion in Truax et al., etc., v. Corrigan et al., 257 U. S.
312, 354, 357-370.

It is contended that defendants have acted in com-
bination, and therefore unlawfully: Allis-Chalmers Co.
v. Iron Molders' Union No. 125 et al., 150 Fed. 155 (E. D.
Wis. 1906) ; Erdman v. Mitchell, 207 Pa. 79 (1903).
See 6 A. L. R. 909, 911-12. But combinations are not
now, per se, taboo. No vicious purpose is present here,

no attempt to raise prices, to drive competitors out of business, nor "do harm . . . for the sole pleasure of doing harm": Holmes, Privilege, Malice, and Intent, supra; and Collected Legal Papers, 117, 124 (1921). Courts have repeatedly approved association by the members of a trade who would extirpate from it demoralizing practices: Appalachian Coals, Inc., et al., v. United States, 288 U. S. 344 (1933); Wolfenstein, etc., v. Fashion Originators' Guild of America, Inc., et al., 244 App. Div. 656, 280 N. Y. Supp. 361. Combinations and even boycotts have been held lawful, often, although not uniformly, when much less innocently motivated: Booker & Kinnaird v. Louisville Board of Fire Underwriters et al., 188 Ky. 771, 224 S. W. 451 (1920); Arnold v. Burgess, etc., 241 App. Div. 364, 272 N. Y. Supp. 534; Cote v. Murphy et al., 159 Pa. 420 (1894); Sorrell v. Smith et al., A. C. 700 (Eng: 1925). See the cases collected in 21 A. L. R. 543 (1922), 92 A. L. R. 185 (1934). And logically this seems correct. If one man may urge another not to buy from a third, why may not two or two hundred join the first, provided they do not all urge simultaneously and thus create a breach of the peace? Association and coöperation have, indeed, as Justice Holmes forecast (Holmes Privilege, Malice, and Intent), become the order of the day. Are the defendant associations more pernicious or more powerful than the combinations of thousands of persons and stores in a chain-store corporation? Surely, if anything, defendants are weaker by their small number, loose and informal organization, and their freedom from the unified control of a small group of men who may dominate a corporation. See Berle & Means on Modern Corporation and Private Property, passim (1932).

There is also, in our opinion, little merit in the contention that, if defendants want grocery stores closed on Wednesday afternoon, they should petition the legislature to enact a statute to that effect, but should not resort to self-help by picketing. See The People of the

State of N. Y. v. Kopezak et al., 153 Misc. 187, 274 N. Y. Supp. 629, affirmed in 266 N. Y. 565, 195 N. E. 202 (1935). Men may seek to win many things by peaceful personal action without government aid. Labor unions are permitted to picket for recognition, for shorter hours, for higher wages and even to induce employers to refrain from themselves working at a job that the union would reserve for its members (Senn v. Tile Layers Protective Union et al., 301 U. S. 468 (1937) ) even though the legislature has not required, and perhaps could not constitutionally require, these things. We have always been led to believe that conflicts of temporal interests were to be peacefully settled as much as possible without recourse to government.

Unavailing also in aid of plaintiffs are the decisions holding legislation unconstitutional which restricts the hours during which ordinary merchandising establishments may transact business: Olds v. Klotz, etc., et al., 131 Ohio St. 447, 3 N. E. (2d) 371 (1936). See also Skaggs, etc., et al., v. City of Oakland et al., 6 Cal. (2d) 222, 57 P. (2d) 478 (1936). Economic persuasion and pressure, as we have indicated, may be employed to induce much that is beyond the pale of legislative action. It has even been suggested that the legislature should not be denied the power to compel plaintiffs to do what defendants would persuade them to agree to. See 85 University of Pa. L. R. 113 (1936), where the reviewer, in criticizing the Olds and Skaggs cases, wrote at page 114, and n. 16:

". . . the statutes here involved do not seem unreasonable, however inexpedient they may have been. . . .

"The ordinances . . . may have been intended . . . to prevent overwork on the part of independent grocers unable to employ clerks in the evening".

Defendants have established that the purpose sought to be achieved by them is not against public policy, and if they confine themselves to peaceful picketing their con-

duct should not be interdicted, even though damage be inflicted upon plaintiffs.

Moreover, it should be remembered that present in this case is a question of free speech, a question ignored too often in the decision of picketing cases. Essentially, picketing has become a publicity medium, designed to advise the public of the existence of a controversy between those picketing and the one picketed: Senn v. Tile Layers Protective Union et al., supra, at page 478. Customers are legally privileged to withdraw their patronage from plaintiffs: Dagostino v. Rogers, 68 Pa. Superior Ct. 284 (1917). Defendants are privileged to request plaintiffs to close. Why then may not defendants urge customers to do what they may lawfully do, if in the urging only what is admittedly the truth be told?

If the customers be not favorably impressed by the cause of defendants, they will effectively check the picketing by ignoring it. In fact, one of the plaintiffs testified that after he had placed a sign in his window stating his reasons for refusing to do as the defendants desired, his business increased. And if, on the other hand, prospective customers refuse to patronize storekeepers because of their sympathy with the cause of defendants, why should they not be told the real nature of the controversy so that they may act intelligently? Picketing should be primarily an informative agent, and when so employed it should not be discouraged. It evidences a healthful, active interest in the problems confronting society, and a sound confidence that people can be persuaded, without force, to aid in making this what one likes to believe will be a better world. But, of course, the truth alone ought to be told, and the entire truth. The signs carried by the pickets misstated nothing and happily were free of epithets. There lurks in them, however, the possibility of misunderstanding, which may easily be corrected. We suggest that to the wording on the placards be added the statement "No Labor Dispute", or "Hours of Employes Not Involved". The neighborhoods in which the picket-

ing is conducted are strongly unionized, and picketing, to their residents, may be definitely linked with labor difficulties. Fairness to plaintiffs requires that their patrons be disabused of any possible notion that this is a labor dispute.

It is, of course, clear that personal violence or destruction of property cannot be tolerated in the guise of picketing. Assaults, the breaking of windows and the mishandling of goods have no lawful rôle in the conflict of economic interests. Obscenity and abusive language should likewise be prohibited. That such conduct is criminal does not bar an injunction, for here "property" rights, as well, have been invaded: Ashinsky v. Levenson, 256 Pa. 14 (1917); Mahon et al. v. Pennsylvania Coal Co., 274 Pa. 489 (1922).

The number of pickets at each store must not be excessive, for numbers may intimidate as easily as actions: American Foundries v. Tri-City Central Trades Council et al., supra; Jefferson & Indiana Coal Co. v. Marks et al., 287 Pa. 171 (1926). Before stores of the type involved here two pickets should be sufficient. Three can convey little more information, and may serve only to create disturbances. One picket alone may be deprived of the opportunity effectively to meet charges that he has violated the terms of the injunction in contempt proceedings.

We are of the opinion that it is immaterial that the pickets are hired by defendants and have no personal interest in the dispute. The hired advocate is not novel, and the hired picket may likewise walk in the stead of his employer and do the same things the latter might lawfully do.

In framing our decree we should be guided by considerations of the effectiveness which it is likely to have in safeguarding the rights of the litigants and in preserving the public peace. We have observed defendants in court and they appeared generally to be respectable and peaceable citizens, who will comply with the letter and the

spirit of our decree. We have not had the opportunity of seeing the pickets hired by defendants. It is therefore suggested that defendants be careful in the selection of their agents, who do the actual picketing, lest the privilege hereby granted be abused.

Of course, plaintiffs, who also impressed the court very favorably, should be cautioned to exercise self-discipline and to resort only to peaceful counter-propaganda.

Defendants should also refrain from entering the stores and dwellings of the members of the plaintiff association. Plaintiffs in this case are entitled to relief against visits by uninvited and undesired delegations. Their stores are not the vast, impersonal property of a company town or of a great manufacturing corporation. See Jefferson & Indiana Coal Co. v. Marks et al., supra, pp. 177-78. The plaintiff association is not large. Its members are not great aggregations of laborors whose names are unknown and who are inaccessible by mail. Plaintiffs have been approached personally and have manifested a very real desire not to be subjected, in their own homes and stores, to any persuasion, however peaceful, by defendants, and we will forbid the intimidation inherent in groups of men, five, eight or ten in number, entering plaintiffs' places of business. It is plain that the privilege to enter upon another's property which may serve a real need in a large labor dispute is unwarranted any longer, under the facts of this case.

### Conclusions of law

1. There is no labor dispute here and the Labor Anti-Injunction Act of 1937, supra, has no application in this case.

2. The right of plaintiffs to conduct their businesses is a property right, which equity will protect from intentional impairment and injury without proper justification.

3. The purpose of defendants to induce plaintiffs to close their stores on Wednesday afternoons, Saturday

evenings and Sundays justifies under the facts of this case the damage inflicted upon plaintiffs by peaceful picketing, with signs stating only what is the truth and the entire truth.

4. The combination of defendants under the facts of this case is not unlawful or in unreasonable restraint of trade, and will not be enjoined.

5. Under the circumstances here, patrolling by two pickets is lawful and will not be enjoined. Patrolling by more than two pickets in this case is unlawful and will be enjoined.

6. The pickets may lawfully carry signs stating that plaintiffs do not coöperate with defendants in closing their stores, provided that the placards bear the further information that this is not a labor dispute, in letters at least as large as the largest in the other words on the sign. The carrying of such signs, under the facts here, is an exercise of the constitutional right of free speech and is not enjoinable.

7. Violent physical destruction of property, intimidation, threats of personal violence and personal injury, obscene language, obstruction of the highways, sidewalks, and store entrances are unlawful in this case, and will be enjoined.

8. Defendants may lawfully hire pickets to patrol in the manner we have described and shall more fully describe in the decree.

9. Entering the houses and stores of plaintiffs by defendants is a trespass, and a continuing one, in view of the situation present here. It is unlawful and will be enjoined.

10. The question of misjoinder or misnomer on the part of plaintiffs, and whether they are improperly seeking to vindicate several rights in a joint suit, under the name of an unincorporated association, has not been raised by counsel. We therefore deem this question waived and do not pass upon it.

11. Plaintiffs have no adequate remedy at law for relief against the unlawful conduct hereby enjoined, and equity does require this court to afford a remedy by injunction. . . .

### Final decree

And now, to wit, February 1, 1938, upon consideration of the foregoing case and the adjudication filed therein, January 19, 1938, it is ordered and decreed as follows:

1. That defendant associations, their members, and the agents, servants, and employes of the associations and of their members, be and they are hereby enjoined from entering the houses or stores of the members of plaintiff association without their previous consent.

2. That defendant associations, their members, or the agent, servants, or employes of the associations or of their members, while engaged in picketing or patrolling the stores of the members of plaintiff association, be and they are hereby enjoined:

(*a*) From committing acts of violence against the persons or the property of plaintiffs, their prospective customers or passers-by, or threatening to do these acts;

(*b*) From placing more than two persons before each of the stores of the members of plaintiff association, for the purposes of picketing or patrolling the same;

(*c*) From walking upon sidewalks other than those on which plaintiffs' premises front;

(*d*) From obstructing the sidewalks and highways by walking at other than a normal pace or by remaining motionless on the said sidewalks and highways;

(*e*) From approaching closer to the premises of the members of plaintiff association than nine feet from the building line;

(*f*) From using obscene language and epithets and from making fraudulent or untrue statements;

(*g*) From carrying signs or placards other than those bearing the information "This store will not close (stat-

ing the time) ", "will not coöperate with (stating whom) ", and requesting customers not to purchase, and in addition bearing the information in letters at least as large as the largest letters in the other words of the sign, that there is no labor dispute or that the working conditions of employes are not involved, and bearing further the name of the association responsible for the picketing;

(*h*) From carrying any other signs unless first approved by this court.

3. That the costs of these proceedings be paid by defendant associations and their members.