**NATIONAL LABOR RELATIONS BOARD
v. NATIONAL SEAL CORPORATION.**

No. 216.

Circuit Court of Appeals, Second Circuit.

Argued March 19, 1942.

Decided May 1, 1942.

Aaron Lewittes, of Washington, D. C., and Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Gerhard P. Van Arkel, Asst. Gen. Counsel, Hilda D. Shea, and David C. Sachs, all of Washington, D. C., Attys., National Labor Relations Board, for petitioner.

Abraham Mann and Kotzen, Mann & Siegel, all of New York City, for respondent.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This case comes before us upon a petition of the Labor Board for an "enforcement order" against the respondent based upon an order of the Board in usual form, made on March 8, 1941. The respondent does not challenge the sufficiency of the evidence to support the findings; but it complains (1) that evidence was admitted of transactions antedating the putative "unfair labor practices" under investigation; (2) that it was not obliged to bargain with the union during the pendency of a "certification proceeding" under National Labor Relations Act, § 9(c), 29 U.S.C.A. § 159(c), begun before the Board by the union; (3) that the respondent's refusal to bargain was not a cause of the strike which occurred at the plant on March 28, 1941, or of its continuance; (4) that its refusal to go further than to sign a letter embodying its "labor policy" was not a refusal to contract in writing; and (5) that the failure of union members to pay their dues automatically ended their membership and the union's authority to represent them. We shall take these up in turn; but by way of introduction we must state the general situation. The respondent makes metal tops for glass jars and metal cans; it employed about 140 persons in March and April, 1940, when the transactions here at bar took place. It was a successor of an earlier corporation called the National Seal Company, Inc., which did the same business and was in charge of the same officers, of whom one, Wainwright, had charge of the labor relations of both companies. In July, 1939, the old company had become heavily indebted and the old shareholders decided to step out and hand over the business to one of the largest creditors. This was accomplished by the purchase of the assets by an intermediary company which at once passed them to the respondent.

So matters stood in March, 1940, when the respondent's officers became aware that the American Federation of Labor was trying to organize the plant. On March 7th, one of Wainwright's subordinates, at Wainwright's direction, had a talk with an assistant foreman named Doweiko, in which he tried unsuccessfully to persuade Doweiko not to join the union. The organizing went on, and on the 14th Carey, the union organizer, wrote a letter to Wainwright asking for an interview. Wainwright answered on the 18th that he doubted whether Carey represented a majority of the employees; but he fixed an interview for the 26th and the two met on that day. Carey would not take up any grievances of the employees until Wainwright recognized him as bargaining representative, which Wainwright refused to do for the avowed reason that Carey, after receiving the letter of the 18th, had filed an application with the Board for a certificate under § 9(c) that he represented a majority. According to Carey, Wainwright nevertheless wished to dispose of any disputes over labor conditions, and in the course of the talk said that he had no doubt "in the back of my head" that Carey had a majority. Wainwright denied this, but he admitted that he had said that he had no power to recognize the union, and that he wished some time to think the matter over. Carey suggested that they wait until the 29th, the day fixed by the Board for the hearing, but Wainwright would not agree, so that there was a postponement until only the next day. Again their talk—this time over the telephone—was inconclusive, and Carey concluded that Wainwright was merely evading recognition of the union. He called a meeting of the employees that night at which they voted to strike the next day, which they did with substantial unanimity, putting forward five grievances of which one was the refusal to recognize the union.

Wainwright saw then, if he did not know it before, that the union represented the majority, and he did not go to the hearing before the Board on the 29th; but on April 3rd with two or three of the respondent's other supervisory employees he had an interview with Carey and several members of the local, who had prepared a written proposal, which Wainwright answered with a counter proposal which expressly recognized the union as bargaining representative. He declared, however, that he had no power to change any of the proposed terms and therefore no real negotiations were possible, to which the union especially objected because the company refused to "enter into a written contract" on the ground that it must remain free to sell out the business on the best terms possible. Instead, it offered to write "a letter" saying that the terms agreed upon "would be the policy of the company * * * and that we would agree to maintain them as long as the employees do not strike." Carey took the company's proposal to the employees, who refused it, in part because of the refusal to sign any contract. Although all negotiations then broke down the strike did not last

long. The employees began to go back to work within a week and the company went into operation by the 15th; by the end of the month substantially all had returned. On April 5th the company sent letters to all employees stating its position and arguing against a closed shop which was one of the union's terms; it followed these by other letters of the same kind on May 7th.

The Board found that the talk with Doweiko on March 7th was an interference with the employees' right to organize under § 7, 29 U.S.C.A. § 157; that the refusal to recognize the union on March 26th and 27th, the refusal to sign a written agreement on April 3rd and to discuss the terms of the counter proposal, and the letters to individual employees, all constituted a continuous refusal to bargain until May 7th. It ordered the respondent to cease from refusing to bargain and from interfering; it directed it to recognize the union and to reinstate those employees who had struck because of the refusal.

■■ With this setting we can now consider the respondent's supposed grievances. The first is the evidence of transactions in 1935 and 1937 between its predecessor, National Seal Company, Inc., and that company's employees, in which Wainwright had acted for the employer. The upshot of the testimony was that Wainwright had told Doweiko to discharge certain employees because of their union activity and had in other ways shown hostility to unions and unionism; and the argument is that earlier transactions should not have been used as proof of the respondent's conduct three years later. We cannot agree. Among the issues were whether Wainwright's refusal to recognize the union on March 26th and 27th was because he had a real doubt that it was the proper bargaining agent, whether he really wished time to think over the matter, and whether he lacked authority to act either then, or on April 3rd. His intent—what he really believed the facts to be—would be determinative of these, because if he knew that the union was the agent and that he had power, he had no excuse for dallying as he did. When intent in that sense is an issue it is always permissible, even in civil actions and criminal prosecutions, to show that the actor has been engaged in other similar transactions. Wigmore § 302. The rationale of this is that if the disputed intent was present on the earlier occasions, it was likely to have been present upon that under inquiry, because the

disposition then shown to exist was likely to persist. It is quite true that the same reasoning can also be applied to the proof of other issues than intent, but the doctrine is confessedly an exception, possibly resting upon the greater difficulty of proving intent than external facts, and whatever its justification, it has been well settled for many years. Wood v. United States, 16 Pet. 342, 360, 10 L.Ed. 987. The cases in the lower courts are legion; we content ourselves with the citation of only the more recent in this circuit. United States v. Rosenstein, 2 Cir., 34 F.2d 630, 635; United States v. Shurtleff, 2 Cir., 43 F.2d 944, 947; United States v. Sprinkle, 2 Cir., 57 F.2d 968; United States v. Dilliard, 2 Cir., 101 F.2d 829, 835; United States v. Reiburn, 2 Cir., 127 F.2d 525. In what we have said we do not mean to suggest that it would have been ground for reversal even though the evidence had not been competent in a court. The considerations which have led courts to forbid its use before juries do not apply to an administrative proceeding. These are that the probative value of the evidence does not balance its tendency to prolong the case, and to confuse the jury by introducing separate and independent controversies. Neither of these applies to an administrative proceeding; and it so happens in the case at bar that the earlier transactions were peculiarly persuasive evidence; they are properly to be regarded as earlier instances of a continuous design rather than as disconnected examples of an enduring disposition. N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 588, 61 S.Ct. 358, 85 L.Ed. 368.

■ The respondent's second point is also without merit. Section 9(c) itself describes the certification proceeding as a "controversy" to be "investigated" in a "hearing upon due notice"; it is conditional upon a "question" which has arisen as to the "representation of employees." Such a "question" had indeed arisen in the case at bar, and, if Wainwright's doubts were real and reasonable, he was justified in awaiting the Board's decision. On the other hand, it is scarcely necessary to say that he could not insist that that was a "question" which he knew was not one, and thus suspend the duty which § 8(5), 29 U.S.C.A. § 158(5), imposed upon him. The Board thought that he had been doing just that; and, if so, it made no difference that his spurious doubts had provoked Carey to file a complaint.

■ The third point is that the strike was not caused by the respondent's refusal to bargain. There can be no doubt that when the strike was called on March 27th, one of the grounds was the refusal to recognize the union. On the other hand the strike certainly did not continue for that reason after April 3rd, for the company on that day recognized the union unconditionally. If that were all, we could not therefore affirm the finding. But as we have said, Wainwright would not discuss any of the terms of the company's proposal, and besides it contained the refusal to sign a written contract, which was itself a refusal to bargain. H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 523–526, 61 S.Ct. 320, 85 L.Ed. 309. Nor did it withdraw from this position in a second proposal—that of May 1st—in answer to which the union declared its determination generally to keep up the strike until it won. The only escape from the Board's finding that the strike continued because of these refusals is in case the substitute offered on April 3rd was the equivalent of a written contract. That it was not. In the first place the excuse given for the refusal was a patent subterfuge; for the respondent would be as much bound by a letter as by a contract, if it sold its business or was liquidated, provided that it meant to be bound at all. Moreover, the union had not asked it to bind its assignees; if it had been part of the terms that the contract should end with the company's life, that could have been put in writing like any other term. But quite aside from the obvious insincerity of the excuse, it was not a good one even on its face. What could have been the purpose of confining the agreed obligations to a "letter" stating the company's "policy"? Read without the earlier refusal to sign a contract, a court might, it is true, interpret such language broadly enough to mean the same thing as a contract; but with that refusal before it, it would almost certainly declare that the "letter" implied a less absolute obligation. What the difference was, it might indeed be hard to say, but that was exactly the point, for the curious locution would at least throw doubt upon the meaning and weaken the force of any agreement, which was doubtless its purpose.

■ There remains the question whether the failure of a union member to pay his dues, ended his membership and the union's authority to act for him. That question became relevant for the following reasons. Carey had testified that the union strikers, eighty in all, who had gone back to work in May, 1940, or earlier, had not paid their dues; and it appeared that the constitution of the union provided that default by a member in the payment of his dues for three months would "automatically cancel membership." If the union no longer represented these eighty men, it no longer represented a majority. The respondent asked the examiner to require the union to produce its book showing who had paid dues and who had not; its position being that if the eighty members had remained for three months in default, the constitution forfeited their membership, and that it then followed that the union no longer represented them for bargaining purposes. The examiner refused the request, and the respondent asked nothing more; it did not suggest that it wished to prove that the union had taken any action to expel the delinquent members, or that the members had declared that the union should no longer represent them. Thus the only question before us is whether the members' default ipso facto ended the union's authority. We think that it did not. This provision of the constitution did not confer a privilege upon the members, but a power upon the union by which it might expel a delinquent without any formal proceeding, perhaps even without a hearing. This is illustrated in the case of mutual insurance associations which do not have to act at the time of default, but may treat the delinquent as automatically ceasing to be a member after the prescribed period. Rood v. Railway Mutual Benefit Association, C.C., 31 F. 62, 64; Gifford v. Workmen's Benefit Association, 105 Me. 17, 72 A. 680, 17 Ann. Cas. 1173. To turn such a clause into a resignation quite inverts its meaning. Perhaps these members' failure to pay their dues and their return to work contrary to the union's order were evidence of a desire not to have the union represent them any longer; but that was not the inevitable conclusion; it was possible that they thought that union membership was not worth what it cost and that the union was foolish to continue the strike; and yet that they would have welcomed continued representation by the union for as long as it would act for them. The default was consistent with that, and if the respondent meant to prove that the representation had ended, it was obliged to go further than it suggested to the examiner. As the point was presented to him, it was bad in law and his ruling was right.

The petitioner is entitled to the usual order.