COMMUNICATIONS WORKERS OF
AMERICA, CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 217, Docket 22926.

United States Court of Appeals,
Second Circuit.

Argued April 14, 1954.

Decided Sept. 22, 1954.

Clark, Circuit Judge, dissented.

Mayer, Weiner & Mayer, New York City (Henry Mayer and Abraham Weiner, New York City, of counsel), for petitioner.

George G. Bott, Gen. Counsel, National Labor Relations Board, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Bernard Dunau, Mary E. Williamson, Attys., Washington, D. C., for respondent.

Before CLARK, HINCKS and HARLAN, Circuit Judges.

HINCKS, Circuit Judge.

This is a petition to set aside an order of the National Labor Relations Board directing the New Jersey Bell Telephone Company (hereinafter called the Company), and the Communications Workers of America, CIO (hereinafter called the Union), to cease and desist from engaging in certain practices deemed by the Board to be in contravention of the National Labor Relations Act, as amended. The Union, as the exclusive bargaining representative of all the non-supervisory employees of the Traffic Department of the Company, is the petitioner.

The facts of the case are not in dispute. On November 2, 1950, the Company and the Union signed a collective agreement. This contract included a union security provision of the type known as a "maintenance of membership" clause. Under this clause, an employee who is a member of the Union as of the effective date of the contract, or who thereafter becomes a member, must continue as such throughout the life of the agreement as a condition of employment. If an employee's membership in the Union is terminated during the contract period, the Company is obligated to discharge him upon notification by the Union. By its own terms this contract expired on April 5, 1952. On April 14, 1952, after a nine day interim period in which the parties were without any agreement, a new contract was signed. The 1952 contract included a maintenance of membership clause substantially similar to the one contained in the 1950 agreement.[1] The validity of the clause is not challenged.

On March 26, 1952, Eleanor Steib, then a member of the Union and an employee of the Company, sent a letter of resignation to the Union. On the same day she wrote the Company cancelling her union dues deduction authorization. While Mrs. Steib's dues were fully paid for the month of March, they went unpaid for that portion of April within the 1950 agreement. Hence, under the maintenance of membership clause, the Union could have validly insisted upon her discharge any time within the 1950 contract period. The Union, however, failed to act at that time and instead waited until October 7, 1952, before demanding her dismissal. The Union explains its delay by referring us to a provision in its own Constitution. Article VI, Section 5, of the Union Constitution provides that if a member's dues are in arrears for sixty days the member is automatically suspended, and if the default continues for an additional thirty days, after notice, the member is automatically ex

---

1. Article XI—Maintenance of Union Membership.

    Section 1. Employees who are members of the Union as of the effective date of this agreement shall, as a condition of employment, maintain membership in the Union until termination of this agreement or until promoted or transferred out of the bargaining unit.

    Section 2. Employees who are members of the Union on or after the 30th day following the beginning of their employment or the effective date of this agreement, whichever is the later, shall, as a condition of continued employment, maintain membership in the Union until the termination of this agreement or until promoted or transferred out of the bargaining unit.

pelled.[2] The Union asserts that it could not take immediate action with respect to Mrs. Steib because of this provision.

The Company complied with the Union's demand that Mrs. Steib be discharged. She then brought a complaint charging that the Union's action in seeking her dismissal was an unfair labor practice under Sections 8(b) (1) (A) and 8(b) (2) of the National Labor Relations Act, as amended.[3] Later the complaint was amended to include charges against the Company under Sections 8 (a) (1) and 8 (a) (3) of the Act for discharging Mrs. Steib.[4] The Trial Examiner, after making findings of fact and conclusions of law, recommended that the complaint be dismissed. However, the Board found that both the Company and the Union had violated the above cited sections and issued a cease and desist order. It also ordered that Mrs. Steib be reinstated.

The Union presents two arguments. The first one is that Mrs. Steib's discharge was justified under the 1952 contract. It is contended that her resignation on March 26, 1952, was ineffective as constituting a termination of her Union membership. The Union argues that under its constitution termination of membership can be effected in but three ways: (1) a member may be expelled upon failure to pay dues for ninety days, (2) a member may leave the jurisdiction of the Union, or (3) a member may be promoted to the supervisory ranks. Voluntary resignation, the argument runs, is impossible.[5] Since Mrs. Steib, if this argument be sound, could not voluntarily resign, she was, under Article 6, Section 5, of the Union Constitution, still a mem-

2. Article VI—Dues, Fines and Assessments.

Section 5—Non-Payment of Dues, Fines and Assessments. A member in default, without good cause, in the payment of any installment of dues or any fine or assessment for sixty (60) days from the date such amount becomes due, shall be automatically suspended from the rights of membership and, if the default continues without good cause for an additional thirty (30) days, after notice in writing by the Local Secretary, shall be automatically expelled from the Union. "Good Cause" shall be that which the governing body of the Local determines to be good cause.

3. Section 8(b) (1) (A) of the Act, 29 U.S.C.A. § 158, provides: "It shall be an unfair labor practice for a labor organization or its agents (1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in" Section 7 of this Act. Section 7, 29 U.S.C.A. § 157, provides: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right ing membership in a labor organization as a condition of employment as authorized in" Section 8(a) (3) of this Act. may be affected by an agreement requir-

Section 8(b) (2) of the Act, 29 U.S.C.A. § 158, states: "It shall be an unfair labor practice for a labor organization or its agents (2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;"

4. Section 8(a) (1) of the Act, 29 U.S.C.A. § 158, states: "It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in" Section 7 of this Act. For Section 7 of the Act, see footnote 3, supra.

Section 8(a) (3), 29 U.S.C.A. § 158, provides: "It shall be an unfair labor practice for an employer—(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization. * * *."

5. It is interesting to note that the Union itself recognized a right to resign. In a letter to Mrs. Steib, the Union stated the following: "Resignations can only be accepted when they comply with the terms of our past and present contract or are tendered when no contract exists."

ber of the Union on March 26, 1952, and continued as such for ninety days thereafter, a period which spanned the nineday interim period during which the parties were without any contract. Therefore she was a member of the Union on April 14, 1952, and subject to the maintenance of membership clause of the 1952 agreement.

The Union's argument hinges on the assertion that Mrs. Steib could not voluntarily resign. In support of this argument our attention is directed to the *proviso* to Section 8(b) (1) (A) of the Act which states the following: " * * * this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein".

■■ We agree that the proviso protects the Union's right to make its own rules with respect to membership, but assuming, *arguendo*, that a rule wholly prohibiting voluntary resignations would be valid, we think that in the absence of any rule on the subject of voluntary resignation, the *proviso* is inapplicable. Concededly the Union Constitution and by-laws are absolutely silent as to whether a member can voluntarily resign. Hence we think that the common law doctrine on withdrawal from voluntary associations is apposite. Under that doctrine, a member of a voluntary association is free to resign at will, subject of course to any financial obligations due and owing the association. Fitzgerald v. Dillon, D.C.N.Y., 92 F.Supp. 681; Arnold v. Burgess, 241 App.Div. 364, 272 N.Y.S. 534; Bossert v. Dhuy, 221 N.Y. 342, 117 N.E. 582.

■ The Union claims, however, that under its "interpretation" of Article VI, Section 5, of the Constitution, Mrs. Steib *could not voluntarily resign* and that under the *proviso* to Section 8 (b) (1) (A), discussed above, this interpretation of its own rules as to membership is final and not reviewable by either the National Labor Relations Board or the courts. With this proposition we can not agree. In N. L. R. B. v. National Seal Corp., 2 Cir., 127 F.2d 776, 779,

Judge Learned Hand very definitely interpreted a rule having to do with union membership. In fact he interpreted a rule which is quite similar to the one in the instant case. He stated: "There remains the question whether the failure of a union member to pay his dues, ended his membership and the union's authority to act for him * * * it appeared that the constitution of the union provided that default by a member in the payment of his dues * * * would 'automatically cancel membership.' * * * To turn such a clause into a resignation quite inverts its meaning."

Though the National Seal case was decided prior to the passage of the Taft-Hartley Act, we do not think that the proviso to 8(b) (1) (A) disturbs its underlying theory. The proviso only states that the union shall be free to prescribe *its own rules with respect to membership*, it does not prohibit the Board and the courts from interpreting those rules.

We are prepared to give weight to the Union's interpretation of its own rules with respect to membership. But notwithstanding we cannot agree that Article VI, Section 5, of the Union Constitution can be construed as a denial of a member's right to resign. Article VI, Section 5, gives the Union the power to expel a member who defaults in his dues; surely it can not be fairly said that an organization's power to expel, standing alone, prohibits a member from resigning.

■ Absent the ninety day grace period in the Union Constitution, petitioner could have sought Mrs. Steib's discharge at any time prior to April 5, 1952. We are now asked to recognize that the ninety day grace period is intended for the benefit of employees and that the Union should not be penalized for complying with it. While we do not pass on the wisdom of Article VI, Section 5 of the Union Constitution, we think we lack authority to convert it into a provision denying voluntary resignation. When the Union and the Company met at the bargaining table, the Company went no further than to accede to a maintenance

of membership contract and the Union thereunder was not entitled to claim, as in effect it does, that it is entitled to rights which, even if not in contravention of the proscription of closed shops, was an incident to an agreement providing for greater union security than that bargained for.

Since there is nothing from which we can fairly infer that voluntary resignation is proscribed, consistent with the cases cited above we hold that Mrs. Steib was free to resign at will. Her resignation was effective forthwith, and because of the nine day interim period immediately prior to the signing of the 1952 agreement, she was not a member of the union during that contract period, and hence not subject to its maintenance of membership clause.

The Union argues in the alternative that the discharge of Mrs. Steib was justified under the 1950 agreement. Its contention, adopted in the report of the Trial Examiner, is that for Mrs. Steib's breach of the 1950 agreement its remedy was not extinguished by the expiration of the agreement. This position seems to depend upon the proposition that Mrs. Steib, as a member of the Union when it made the agreement with the Company was in effect a party—a co-obligor—to the agreement. Assuming, *arguendo*, that she was, nevertheless, by the terms of that agreement, she bound herself no further than to assume a liability to be discharged during the life of the agreement and the Company bound itself to accomplish her discharge on Union request only during the life of the agreement. The fact that nine days after the expiration of the 1950 agreement another agreement was made cannot serve to enlarge the obligations theretofore existing.

We hold, therefore, that her subsequent discharge on Union demand made long after the expiration of the 1950 contract was not in discharge of any obligation arising from the agreement and hence was an unfair labor practice. This is so not because the remedy for a breach of contract may not survive the contract: it is because the company's obligation to discharge and Mrs. Steib's liability to be discharged for non-maintenance of union membership terminated with the 1950 agreement with the result that thereafter there were no obligations which could be the subject-matter of breach. To hold otherwise would be to read into the agreement a provision which is wholly absent—a provision that the agreement should remain in effect until superseded by a subsequent agreement—thus affording a greater security for the Union than it obtained at the bargaining table.

This holding is in accord with Colonie Fibre Co. v. N. L. R. B., 2 Cir., 163 F.2d 65, 69, where the following was stated: "Although Blais and Blair did not pay dues in the AFL from January through March 1945, *it is unnecessary to pass on the effect of such nonpayment,* inasmuch as the original contract expired on March 14, 1945, *and no demand was made during the effective period of this contract* that these employees be discharged for failure to pay dues." [6] The Trial Examiner relied in part on National Lead Co., Titanium Division, 106 N. L. R. B. No. 96. This decision is clearly distinguishable from the instant case for numerous reasons, chief of which is that while discharge for nonpayment of dues during the period of the first union security agreement did not take place until after the expiration of the agreement, the first agreement was immediately succeeded by a second such agreement, *with no interim period.*

It is true that Mrs. Steib might have had grounds for an unfair labor practice charge against the Union if the Union had sought her discharge before April 5, 1952, on the ground that the Union had failed to live up to their own Constitution in not affording her the ninety day grace period under Article VI, Section 5. Under the peculiar facts of this case, the Union was thus put in a dilemma. Compliance with its Constitution

---

6. Here, as elsewhere, in this opinion, emphasis unless otherwise indicated is supplied.

would preclude insistence on Mrs. Steib's discharge while the 1950 agreement was in effect. If, on the other hand, it demanded her discharge in contravention of its constitution its action might be viewed as an unfair labor practice. But from this dilemma we cannot extricate it, without adding to the only agreement emerging from the bargaining table.

The petition to set aside the order of the National Labor Relations Board is denied and the Board's cross petition for enforcement is granted.

CLARK, Circuit Judge (dissenting).

Rejecting the able report of its trial examiner, the Board has construed the cherished union security provision of this collective bargaining agreement in such a way as to nullify it in the present context. Such a construction is clearly not a required one; in my judgment it is not even a permissible one. It is in fact unjustifiably harsh and technical, at variance with the parties' settled intent which is re-emphasized by their continuance of the provision when they came to make their new contract. The only possible justification for such an interpretation, I submit, would be a settled policy to discourage this type of "maintenance of membership" agreement. The Board actually does take this position in stressing that the authorizing provision of the Taft-Hartley amendments to the N. L. R. A. § 8(a) (3), 29 U.S.C. § 158 (a) (3), is "to create an exception to the blanket proscription spelled out in Section 8(b) (2)" which "outlaws" this type of conduct. See the Board's decision, 106 NLRB No. 245. But this is to make an extremely extensive and dubious deduction from a merely natural form of statutory language by way of a *proviso*, which is actually framed in broad and inclusive terms: "Provided, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization" of the kind here in issue. In truth the legislative history is to the contrary, showing that even the Taft-Hartley pro-

ponents, including Senator Taft himself, wished to aid the unions in their struggles against "free-riders." See Sen.Rep. No. 105 on S. 1124, 80th Cong., 1st Sess., 1 Legislative History of the Labor Management Relations Act, 1947, 413 (1948), and remarks of Senator Taft, 2 Legislative History 1010, also 1124, 93 Cong. Rec. 3837, also 4193. This new interpretation, contrary to that advanced by the Union and accepted by the employer here, will, I fear, be disturbing of the apparently good labor relations of the parties hereto. Further, it is very definite notice that milder forms of union security agreements are likely to prove illusory; and it carries a quite unconcealed admonition that a union must be hard-boiled and intransigent at "the bargaining table" and—obviously—thereafter if it is to obtain the benefit of a union maintenance provision.

It is clear that if a union is to survive in a plant it must meet in some manner the threat of the "free-rider," the employee who wants to take all the benefits of union activity and share none of the burdens. A natural course is a union security provision in the controlling collective bargaining agreement; and if a comparatively mild provision, of the kind here involved, will meet the parties' needs, it should be encouraged. That Mrs. Steib was determined to be a free-rider is of course not disputed; she said as much in her letter of so-called "resignation" when she relied upon her "over ten years service" to show that she did "not have to remain a member." Of course this length of service did not excuse her from the responsibilities she had assumed; and hence, except for the chance that the time for negotiating a new contract had arrived, she would surely have had to receive the penalty here given her by the employer at the Union's request. In the setting of the labor relations at this plant, the factor of the technically new contract, even with the few days' intervening interval, was not of realistic significance, since the parties intended to and did go on just as before, so far as this aspect of their re-

lationship is concerned. Nevertheless legally it has been worked out so as to give this lady an opportunity for the free ride she sought.

If Mrs. Steib did plan all these things to happen just as they did, she must be considered as something of a wizard in legal and labor tactics; but everything has happened in almost too pat a way to be believable as planned occurrences or other than fortuitous events. For not only was her choice of time most favorable to her program, but also her choice of language of "resignation." Much has been made by the Board of her right to "resign," of her not being "bound to involuntary membership a single day," with apparent overtones against supposed involuntary or penal servitude of work. In fact resignation as from a club has no significance in this setting; it is not noted or mentioned in the collective bargaining agreement or in the statute—beyond the provision of the latter (which is deserving of more force than it has here received) against impairment of the right of a labor organization to prescribe its own rules with respect to the retention of union membership. Sec. 8(b) (1) (A), 29 U.S.C. § 158(b) (1) (A). What is here important is the payment or nonpayment of union dues. Had Mrs. Steib framed her statement as a refusal to pay dues any longer, because of her asserted long service— the actual meaning of what she did say —there would then have been no basis for her reinstatement; indeed, perhaps this entire proceeding would have been avoided.

The timing of her safari has, however, enabled the raising of an issue as to which of the two bargaining agreements governed. The Board has accused the Union of inconsistency in claiming under both contracts and has found this an added basis for rejecting both claims. But there seems nothing wrong in these claims; there is no factual inconsistency or dispute, and it is a truism of modern pleading that a claimant can present his various theories of law without regard to formal or surface consistency,

it being up to the tribunal to determine the correct application of the law. So here Mrs. Steib was in default during the term of the first contract, and I see nothing improper or prejudicial in the Union's so claiming or in the trial examiner's so finding as a basis for his recommendation of dismissal of the complaint. But I do think the Board holding, reiterated here, that termination of the contract wipes out previous defaults is definitely erroneous and quite unfortunate as a future precedent. I see no basis in the law or the cases to give such a healing effect for deliberate breaches of obligation to either the passing of time or the termination and re-execution of the contract.

On another ground, however, I agree with the Union's present position before us, namely, that the default, and the resulting discharge, occurred under the second contract. That appears to me to follow by reason of the period of grace accorded under the Union's constitution before a default in paying dues becomes final. That provision, so obviously for the benefit of the employee—so much so that I venture to believe we would not have considered the Union's case for a moment had it not observed the requirement—has here been given little weight except to hold that it creates a "dilemma" for the Union, from which we will not extricate it, as to how it can observe this agreement and yet practically enforce its union security agreement. But the dilemma, I submit with all deference, is not for the Union, but for those who interpret these simple and natural provisions to be at variance with one another. Actually they seem clearly to require that the default cannot be recognized until after the period of grace expires. This is what the Union did; hence its ultimate action was proper and timely under the second contract, as earlier action would not have been under either contract.

Of course I am rejecting the view that Mrs. Steib had earlier "resigned." Perhaps I have sufficiently shown my own conviction that this supposed difficulty is

entirely semantic. Unless the maintenance-of-membership provision is to be rendered entirely nugatory, her refusal to pay dues cannot be beautified or concealed or propped up by any attempted "resignation." The Union was quite correct and discriminating in its refusal to "honor" this attempt; and its subsequent actions were in accordance with agreement and law. The proceeding ought therefore to be returned to the Board for such a holding.